666 P.2d 504

James Floyd MARLAR,
Plaintiff-Appellee,

v.

STATE of Arizona, a governmental entity, Department of Economic Security, an agency of the State of Arizona, and Robert L. Harris, Defendants-Appellants.

No. 1 CA–CIV 6503.

Court of Appeals of Arizona,
Division 1, Department D.

Feb. 17, 1983.

Rehearing Denied Mar. 22, 1983.

Review Denied May 17, 1983.

Robert K. Corbin, Atty. Gen. by David Rich, Asst. Atty. Gen., Phoenix, for defendants-appellants.

Ryley, Carlock & Ralston by James M. Marlar and Charles L. Chester, Phoenix, for plaintiff-appellee.

## OPINION

MEYERSON, Judge.

In this appeal, we are called upon to determine the propriety of certain actions taken by an agency within the Arizona Department of Economic Security (DES) which administers the Business Enterprises Program, Services for the Blind (BEP). The facts necessary for the disposition of this appeal are as follows.

## I. FACTS

Plaintiff-appellee James Floyd Marlar (Marlar) is an independent businessman, licensed to operate a food service facility in a government building, pursuant to a federally-funded vocational rehabilitation program for the blind authorized under the Randolph-Sheppard Act. 20 U.S.C.A. §§ 107–107f (1974 & Supp.1982). Although the Randolph-Sheppard Act applies to the operation of vending facilities on federal property, Arizona has made the program applicable to state, county, and municipal property. A.R.S. § 23–504.A. (Supp.1982). The Randolph-Sheppard Act authorizes each state to establish a "licensing agency" for the purpose of administering the act. In Arizona, the licensing agency is the Rehabilitation Services Administration, Services for the Blind, an agency within DES. The BEP is operated by the licensing agency; it has direct contact with blind vendors, such as Marlar, and is responsible for licensing an individual as a vending facility manager (manager). A.C.R.R. R6–4–704.E.

Between 1973 and 1980, Marlar was licensed to operate a cafeteria in the basement of the State Education Building, 1535 West Washington, in Phoenix. Once a particular location is identified and a manager

placed in a location, a contract is entered into between the licensing agency and the vendor. Such a contract was executed between Marlar and BEP with respect to the location at 1535 West Jefferson. In 1979, BEP announced that a new cafeteria facility would be available at 1300 West Washington, Phoenix; Marlar applied for that location and was chosen as the successful applicant. He moved into the new facility in March, 1980. Although no contract was entered into between Marlar and BEP with regard to the location at 1300 West Washington, DES concedes this was an oversight and for the purpose of this action, DES acknowledges that Marlar does have a valid contract.

The incident out of which this appeal arises occurred on January 2, 1981. Sometime in the morning, Marlar gave a document to two DES employees as they passed through the cafeteria line. The document, which Marlar described as a "joke," was written in the form of guidelines adopted by the "State Game Commission" which described rules applicable to the hunting and killing of "wetbacks." The document was replete with racial and ethnic slurs and could easily be interpreted as offensive, racist, and was completely inappropriate in any setting, much less in DES or any other agency of government. One of the employees read only several lines of the document and returned it immediately to Marlar. The other employee read it entirely and was so offended that he contacted the administrator of the licensing agency, Tom Tyrrell, and the DES equal employment officer, Theresa Ruiz. Later that morning, Ruiz went to the cafeteria and spoke with Marlar and confronted him about the document (although at this point she had not yet read it). She told Marlar that she was under the impression that it was disparaging to Hispanics and that he was jeopardizing his contract. Marlar responded that the document was "funny."

Ruiz wrote a memo to Tyrrell describing the incident and attached a copy of the document which Marlar distributed. She sent a copy of her memo and the document to a number of other DES officials. Apparently, with the exception of the two individuals to whom the document was initially shown, all other DES employees who actually saw the document did so in conjunction with investigative and disciplinary efforts made by DES. The incident became an immediate topic of conversation within DES and a number of complaints were received by Ms. Ruiz from individuals complaining about the distribution of what they understood to be a racist and offensive joke. Many individuals refused to eat in the cafeteria after learning of Marlar's actions.

The BEP program supervisor, Robert L. Harris, learned of the incident on January 5 while out of town. By January 6, Harris, after consultation with his supervisor, determined that Marlar should be transferred because of bad business practices or mismanagement. That same day, Harris met with Marlar to inform him of the decision with regard to his transfer. Marlar was asked if he would agree to the transfer and he said no. On January 8, Marlar was informed of the transfer; between the 6th and the 8th the matter had reached the attention of William Jamieson, Jr., the director of DES who instructed Tyrrell, through an intermediary, that Marlar should be removed from the building.

On January 8, Marlar was informed in writing that because of "an alleged discrimination charge that has developed from actions that took place at your place of business. . . . DES has requested that you be removed from the facility for the alleged misconduct . . . ." The letter was reviewed and approved by Tyrrell and Jamieson. This action was taken pursuant to A.C.R.R. R6–4–704.J.5. which provides that the "[a]gency may transfer an individual when management-related problems indicate a more suitable location would be in the best interests of the individual and/or the overall program." Because no site was available, Marlar was placed on manager-at-large status which would make him eligible to apply for subsequent available locations.

Marlar sought administrative review of the transfer action and on January 23, 1981,

the acting manager of the licensing agency issued a decision affirming the transfer but providing that it "be effected when an actual position is available so as not to deny [Marlar] from earning a livelihood . . . ." Marlar appealed that determination and a five-day evidentiary hearing was held. On March 3, 1981, the hearing officer found that BEP reasonably concluded that a management-related problem was caused by Marlar's conduct and affirmed Marlar's transfer. Marlar then sought review of the hearing officer's decision from Jamieson. On March 31, 1981, Jamieson sustained the decision to transfer Marlar.

Thereupon, Marlar brought suit pursuant to the Administrative Review Act, A.R.S. §§ 12–901–914. On April 13, 1982, judgment was entered in Marlar's favor. The superior court judge concluded that (1) Marlar's conduct did not constitute a management-related problem and (2) Marlar could not be transferred unilaterally by DES without his consent. DES was further ordered to reinstate Marlar at the cafeteria location in 1300 West Washington. That relief was automatically stayed pending this appeal.

Four issues are presented for our review. DES contends that (1) the trial court lacked jurisdiction because Marlar failed to join DES Director William Jamieson as an indispensable party, (2) there was substantial evidence to support its conclusion that Marlar's conduct constituted a management-related problem, (3) it had authority to transfer Marlar without his consent and (4) the trial judge erred in granting attorneys' fees to Marlar.

## II. JURISDICTION

■ DES contends that the superior court lacked jurisdiction to consider Marlar's complaint because he failed to join director Jamieson as a party. DES argues that because the legislature has not provided that it has the capacity to sue or be sued, the director is therefore an indispensable party in actions under the Administrative Review Act. We disagree; in an action filed under the Administrative Review Act the plaintiff need name as defendants only the "agency and all persons, other than the plaintiff, who are parties of record in the [administrative] proceedings . . . ." A.R.S. § 12–908.

DES's reliance upon *Grande v. Casson,* 50 Ariz. 397, 72 P.2d 676 (1937) is misplaced. *Grande* was a suit against the state for damages arising out of the alleged negligent construction of a concrete curb causing flood waters to run on to the plaintiff's property. Grande named as a defendant the Arizona State Highway Commission but did not name the members of the commission. The court found that the highway commission was not a proper party because the legislature had enacted "no provision authorizing suits to be brought by or against the Highway Commission in its official capacity." 50 Ariz. at 409, 72 P.2d at 681. *See Kimball v. Shofstall,* 17 Ariz.App. 11, 13, 494 P.2d 1357, 1359 (1972).

Although enabling legislation for DES does not specifically provide for the capacity to sue and be sued, A.R.S. §§ 41–1951–94, it does provide, however, that appeals from decisions by the director shall be taken pursuant to the Administrative Review Act. A.R.S. § 41–1993 (Supp.1982). The Administrative Review Act expressly provides that a plaintiff filing an action pursuant to its provisions shall name the "agency" as a defendant. A.R.S. § 12–908. Thus, unlike in tort actions as in *Grande,* we find that the legislature has authorized suits to be brought directly against administrative agencies in cases filed under the Administrative Review Act.

Our conclusion is consistent with Rule 19, Ariz.R.Civ.P., concerning joinder of persons needed for just adjudication. A person (1) in whose absence complete relief cannot be accorded to those already parties or (2) who claims an interest in the action and the disposition of the action may impair his ability to protect that interest or leave those already parties subject to a risk of double or inconsistent obligations, should ordinarily be joined as a party. *Id.* We fail to see how the director of DES falls within any of the foregoing categories. Re-

lief can be accorded among those already parties even in the absence of the director. The record is devoid of any interest in the proceeding claimed by the director and the disposition of this litigation will not affect any interest that the director may have nor will it leave any of those already parties to the litigation subject to the risk of incurring double or inconsistent obligations. Thus, we see no reason to conclude that the DES director is needed for the just adjudication of this proceeding.

## III. MANAGEMENT–RELATED PROBLEM

■ The superior court judge concluded that the director of DES abused his discretion in affirming the "lower administrative decisions" with respect to Marlar's conduct. The trial judge concluded that because all but two individuals saw the document as a result of dissemination by DES employees, Marlar's limited distribution of the document did not create a management-related problem. On appeal, the dispute between the parties centers around the appropriate standard of review to be applied to findings by an administrative agency and whether there was sufficient evidence before the hearing officer to warrant the conclusion that Marlar had caused a management-related problem.

"The scope of the superior court's review under A.R.S. Sec. 12–910 is limited to deciding whether the administrative decision involved an abuse of discretion or was arbitrary and capricious, or to inquire whether the record contains evidence of a substantial nature to support the decision." *Klomp v. Arizona Dept. of Economic Security,* 125 Ariz. 556, 557, 611 P.2d 560, 561 (Ct.App. 1980) (citations omitted).

In determining whether an administrative agency has abused its discretion by acting in an arbitrary and capricious manner, we review the record to determine whether there has been 'unreasoning action, without consideration and in disregard for facts and circumstances; where there is room for two opinions, the action is not arbitrary or capricious if

exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached.'

*Petras v. Arizona State Liquor Board,* 129 Ariz. 449, 452, 631 P.2d 1107, 1110 (Ct.App. 1981) (quoting from *Tucson Public Schools v. Green,* 17 Ariz.App. 91, 94, 495 P.2d 861, 864 (1972)). Citing *Gardiner v. Arizona Dept. of Economic Security,* 127 Ariz. 603, 605–606, 623 P.2d 33, 35–36 (Ct.App.1981), Marlar contends that the superior court is free to substitute its judgment for the agency's conclusion regarding the legal effects of the facts found by the administrative agency. We do not disagree with this contention but find that the determination of what is a management-related problem was a factual determination which may only be upset upon a showing that there was insufficient evidence to support the factual finding. On this record, we conclude that the superior court erred in finding that the director of DES abused his discretion in concluding that Marlar's conduct constituted a management-related problem.

The document passed out by Marlar was a vile attempt at humor. It pretended to be a memorandum from the "State Game Commission" stating that in place of game animals there will be an open season on the "South-Western Wet Back (known locally, as Mexican, Greaser, Grease Ball, Spic, Mex., or Low Rider)." The "joke" continues in the same derogatory vein. For example, it states that it is unlawful to shoot in taverns because the "bullet may ricochet off the grease and injure a civilized white person." "Traps may not be set in welfare offices." If a wetback "is seen on the highway; you may kill it, just don't pick the greasy bastard up." Throughout the proceedings, Marlar has continued to contend that this type of material is funny. Marlar's sense of humor is offensive and viciously perverse.

Marlar showed this excuse for levity to two people passing through the cafeteria line in a commercial business which he operated in a public building under a vocational

rehabilitation program authorized by the State of Arizona and the Federal Government. In our view, that conduct alone would have been sufficient for the licensing agency to conclude that Marlar created a management-related problem. Once the document was brought to the attention of the equal employment opportunity officer, a process was set in motion which would of necessity result in the viewing of the document by others. The fact that other employees of DES saw the document as a result of the investigative process does not mean that DES caused the resulting furor which erupted over this incident. It was Marlar's actions which brought about the inquiry into his conduct and which necessarily resulted in the further disclosure of the document. Had it not been for Marlar's gross indiscretion and his complete failure to exercise proper judgment, the controversy which prompted the transfer decision would not have occurred. For these reasons, we find that there was no abuse of discretion in the conclusion that Marlar's conduct created a management-related problem.

## IV. TRANSFER

Having found that the administrative hearing officer correctly determined that Marlar's actions created a management-related problem, we turn to the question of whether under such circumstances Marlar could be transferred to another location without his consent. The resolution of this issue involves an interpretation of A.C.R.R. R6–4–704.J. which provides as follows:

J. Transfers

1. All transfers of Managers shall be mutually agreeable to the Managers involved and the B.E.P. Supervisor.

2. Transfer may be requested by a Manager, by the grantor, or by the Agency.

3. An individual may request transfer to another location for any reason.

4. The grantor or designees for the grantor may request transfer of an individual when management is changing location and desires to have the continued service of the same individual in the new location. This transfer shall be predicated on the individual's past performance and ability to manage the new location.

5. The Agency may transfer an individual when management-related problems indicate a more suitable location would be in the best interest of the individual and/or the overall program.

This regulation, on its face, leads to conflicting interpretations. And, as might be expected, Marlar contends that pursuant to subparagraph (1), transfers may not be made without the consent of the manager, whereas DES relies on subparagraph (5) which suggests that the agency (referring to the licensing agency) may transfer a manager in the case of a management-related problem. The superior court judge agreed with Marlar and we affirm that ruling.

■ The regulation on its face is ambiguous and is susceptible to two equally convincing interpretations. On one hand, the regulation provides that all transfers must be with the consent of the manager involved; on the other hand, subparagraph (5) provides that the agency may transfer a manager in the case of a management-related problem without specifically imposing a requirement for mutual consent. The latter inference can be drawn from the fact that subparagraphs (2)–(4) use the words "request" whereas subparagraph (5) does not. Because we find the language of the regulation to be ambiguous, we must attempt to interpret or construe it according to principles of statutory construction. *See Continental Casualty Co. v. Industrial Commission,* 113 Ariz. 116, 118, 547 P.2d 470, 472 (1976). The same principles of construction that apply to statutes apply to rules and regulations promulgated by an administrative body. *Department of Highways v. Green,* 586 P.2d 595, 603 n. 24 (Alaska 1978); *Higginson v. Westergard,* 100 Idaho 687, 691, 604 P.2d 51, 55 (1979).

■ The fundamental purpose of statutory construction is to determine legislative intent, *Arizona Department of Revenue v. Maricopa County,* 120 Ariz. 533, 587 P.2d 252 (1978), or in this case the intent of

the licensing agency which promulgated the regulations pursuant to the Randolph-Sheppard Act. 34 C.F.R. § 395.4 (1981). A statute, or regulation, is to be given such an effect that no clause, sentence or word is rendered superfluous, void, contradictory, or insignificant. *State v. Deddens,* 112 Ariz. 425, 429, 542 P.2d 1124, 1128 (1975). Furthermore, an administrative regulation is to be given such an interpretation which will further the statutory policy contained in its enabling legislation. *See Pluss v. Department of Revenue,* 173 Colo. 86, 476 P.2d 253 (1970).

■ Our conclusion that Marlar could be transferred only with his consent is based upon two grounds. First, our interpretation of the regulation is consistent with and harmonizes the entire section dealing with transfers. Second, it furthers and effectuates the federal policy set forth in the Randolph-Sheppard Act.

Subparagraph (1) of the regulation begins with the broad statement that "[a]ll transfers of Managers shall be mutually agreeable to the Managers involved and the B.E.P. Supervisor." Subparagraph (2) then provides that a transfer "may be requested by a Manager, by the grantor, or by the Agency." Thus, the language in subparagraph (2) which provides that a transfer "may be requested" by any one of the three principal parties to the relationship is consistent with the broad statement requiring consent contained in subparagraph (1). Subparagraphs (3)–(5) go on to provide the circumstances under which each of the three parties—the manager, the grantor, or the agency—may request a transfer. Admittedly, subparagraph (5) omits the word "request" which is contained in subparagraphs (3) and (4). But in order for us to conclude that an agency may transfer a manager without his consent, as DES argues, we must ignore the express language of subparagraphs (1) and (2). Principles of statutory construction militate against such analysis. We therefore find that the only way the entire regulation may be given a consistent meaning is to conclude that

transfers sought by the agency must be with the consent of the manager.

There is a second reason which supports this interpretation of the regulation. Such an interpretation is consistent with the federal act establishing the blind vendor program. The Randolph-Sheppard Act was enacted for the purpose of "providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting ...." 20 U.S.C.A. § 107(a) (Supp.1982). Regulations promulgated to implement the provisions of the Randolph-Sheppard Act provide that the "State licensing agency shall attempt to resolve day-to-day problems pertaining to the operation of the vending facility in an informal manner with the participation of the blind vendor ...." 34 C.F.R. § 395.36 (1981). Because the regulations adopted by the licensing agency should be read together with the underlying federal law and its implementing regulations, *see Ashcroft v. United States Department of Interior,* 513 F.Supp. 595, 598 (D.Ariz.1981), *rev'd on other grounds,* 679 F.2d 196 (9th Cir.1982), we find that a unilateral transfer would be inconsistent with the federal policy of promoting the independence and self-esteem of participants in the blind-vendor program.

■ One further argument of DES deserves mention. DES strongly urges that its interpretation of the disputed regulation should be given great weight and deference. Ordinarily, an agency's interpretation of a statute or regulation which it implements is entitled to great weight. *Police Pension Board v. Warren,* 97 Ariz. 180, 186, 398 P.2d 892, 895 (1965). Although the ultimate responsibility for interpreting a statute or regulation rests with the courts, *Dearing v. Arizona Dept. of Economic Security,* 121 Ariz. 203, 207, 589 P.2d 446, 450 (Ct.App.1978), our appellate courts do give more deference to an agency's long-standing interpretation of its own rules. *See Industrial Commission v. Harbor Insurance Co.,* 104 Ariz. 73, 76, 449 P.2d 1, 4 (1968);

*City of Mesa v. Killingsworth,* 96 Ariz. 290, 296, 394 P.2d 410, 414 (1964).

■ In this case, the regulation governing Marlar's transfer did not become effective until January 7, 1981, one day before Marlar was informed of the transfer. A.C. R.R. R6–4–704 (historical note). Testimony at the administrative hearing concerning the licensing agency's previous practice with respect to transfers of managers was from Ella Mae Jensen, Chairman of the Arizona Participating Operators Committee (APOC). APOC is a committee of blind vendors authorized under the Randolph-Sheppard Act. Ms. Jensen testified that APOC would meet when a transfer of a manager was contemplated to determine if the transfer was to a comparable location and if it were in the best interests of the program. She testified that the BEP supervisor would participate in such meetings. She was asked specifically whether she was aware of any transfer in which the manager did not consent to the transfer and she testified that she knew of no transfer that had occurred without the mutual consent of the supervisor and the manager. Thus, because it had been the licensing agency's practice to obtain the consent of the manager prior to any transfer, and because the regulation became effective only one day before Marlar's transfer was directed, we do not feel constrained to grant any deference to DES's interpretation of this regulation.

Finally, we note that DES is not without a remedy for a situation such as occurred here. A probation procedure exists for those circumstances "[w]hen justifiable customer complaints are received by the B.E.P. office, or when the Specialist observes the need for improvement in . . . any activity that is detrimental to the location or the B.E.P. Program . . . ." A.C.R.R. R6–4–704.N. Under such circumstances the specialist is to prepare a facility report and give the vendor six weeks to correct the problem. *Id.* If corrective action is not taken, the vendor is placed on probation; if remedial measures are not ultimately taken, the vendor's license may be revoked. *Id.*

Furthermore, the contract executed between Marlar and the state licensing agency provides that the licensing agency may terminate the contract "if the business of the vending facility is not conducted in accordance with this agreement, or with applicable Federal, State or local laws and the regulations governing the Business Enterprises Program." According to the record before us, DES does not contend that Marlar's conduct violated the contract. Nevertheless, termination of the contract pursuant to the foregoing provision is another remedy available to DES where a vendor conducts his business in a discriminatory fashion. *See* 34 C.F.R. § 395.-35(a)(2) (1981).

### V. ATTORNEYS' FEES

The trial judge awarded Marlar $14,959.50 in attorneys' fees pursuant to A.R.S. § 12–348, which provides for an award of fees in litigation involving the state in certain types of actions, including suits filed under the Administrative Review Act. A.R.S. § 12–348.A.3. DES objects to the fee award claiming that (1) Marlar rejected a favorable offer of settlement, (2) the litigation concerned Marlar's entitlement to a monetary benefit and that fees for such actions are precluded under the statute, (3) a superior court order denying a preliminary injunction constituted a determination on the merits prior to the effective date of the statute, and (4) the litigation was protracted by Marlar. We find all of DES's arguments to be without merit.

■ DES's first contention is that the trial judge should have denied fees because Marlar rejected a favorable offer of settlement. The statute provides that the "court in its discretion may deny the award provided for in this section, or may reduce the award, if it finds that . . . the prevailing party refused an offer of settlement which was at least as favorable to the party as the relief ultimately granted." A.R.S. § 12–348.B.3. This argument is without merit because the record is unequivocally clear that no offer of settlement was made to Marlar during the course of the administra-

tive hearing nor during the course of the litigation in the superior court. During the administrative hearing, counsel for DES stated that an offer made to Marlar to transfer him to 1601 West Jefferson "is not a compromise or negotiation. It is simply an offer of transfer." Thus, there being no indication in the record that any offer of settlement was proposed by DES, DES's objection to the fee award on this ground is not sustainable.

██ DES's second contention is that the fee award was not justified because this is an "action arising from a proceeding . . . in which the role of the state was to determine the eligibility or entitlement of an individual to a monetary benefit or its equivalent . . . ." A.R.S. § 12–348.F.1. DES contends that the issue which was the subject of the administrative review process was Marlar's continued participation in the management of a cafeteria under the BEP. This, according to DES, is equivalent to a monetary benefit.

In our view, the decision to transfer Marlar to another location was not a determination of his eligibility or entitlement to a monetary benefit or its equivalent. No question has been raised in these proceedings with respect to Marlar's eligibility to serve as a manager under the Randolph-Sheppard Act. In no way can DES's decision to transfer Marlar fit within the exemption claimed to preclude the award of fees.

██ Next, DES argues that A.R.S. § 12–348 does not apply retroactively to cases where a determination on the merits has been made before the act's effective date (July 25, 1981),* *Kromko v. State,* 132 Ariz. 161, 164–65, 644 P.2d 897, 901 (1982); thus, DES claims that fees may not be awarded to Marlar because the trial judge refused on April 15, 1981, to stay the administrative decision. In a minute order entered that date, the trial court found that Marlar failed to demonstrate that he would have a substantial probability of prevailing on the merits and therefore refused to order a stay of the transfer decision. We fail to see how the trial court's ruling that Marlar did not sustain his burden of showing a substantial probability of prevailing on the merits as being, itself, a determination on the merits. Although DES argues that there is a distinction between the term "adjudication" as used in A.R.S. § 12–348.-A. and "determination," any distinction which may exist between these terms (we do not rule on whether there is a distinction) is of no avail to DES. Regardless of any difference in the meaning of those terms, the decision denying the stay is not a determination on the merits. *Cf.* 11 C. Wright & A. Miller, Federal Practice and Procedure, § 2948 at 449–57 (1973).

██ Finally, DES argues that the litigation was protracted by Marlar and therefore pursuant to A.R.S. § 12–348.B.1. (fees may be reduced or denied if the court finds the prevailing party "unduly and unreasonably protracted" the resolution of the litigation) fees should have been denied. As "evidence" of protracted litigation, DES points to several extensions which were requested by Marlar and agreed to by DES. We find no abuse of discretion in the trial

---

* DES additionally argues that Marlar is not entitled to reimbursement for legal fees incurred prior to the effective date of A.R.S. § 12–348. A similar contention was disposed of against the position asserted by DES in *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). The Court considered whether § 718 of Title VII, the Emergency School Aid Act, 20 U.S.C.A. § 1617 (providing for an award of fees to be made in litigation under the act) authorized an award of fees for expenses incurred prior to the date the statute came into effect. The court held that it was to "apply the law in effect at the time it

renders a decision unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016.

Although A.R.S. § 12–348 was made applicable to actions pending on its effective date, we see nothing in the legislative history of the statute which would warrant the conclusion that the legislature intended to deny payment for legal services rendered prior to that date in a "pending" action. Similarly, we see no manifest injustice in imposing upon a state agency the obligation to pay legal fees incurred prior to the effective date of the statute.

court's decision to grant fees despite several continuances stipulated to by the parties.

## VI.  SUMMARY

In summary, we hold (1) the director of DES need not be joined as a party in a suit filed against the agency under the Administrative Review Act; (2) DES correctly concluded that Marlar's conduct constituted a management-related problem within the meaning of A.C.R.R. R6–4–704.J.; (3) DES could not transfer Marlar pursuant to A.C. R.R. R6–4–704.J. without his consent; and (4) DES's objections to the award of attorneys' fees are without merit.  Thus, despite our conclusion in (2) above, because Marlar could not be transferred without his consent, we affirm the judgment of the superior court.

HAIRE, P.J., and EUBANK, J., concur.