IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

RONALD A. SIMMS,
*Plaintiff/Appellee-Cross Appellant*,

v.

ARIZONA RACING COMMISSION;
JEREMY E. SIMMS, an individual;
TP RACING, LLLP, a limited liability limited partnership,
and BELL RACING, LLC, a limited liability company,
*Defendants/Appellants-Cross Appellees.*

No. 1 CA-CV 18-0546
FILED 4-28-2022

Appeal from the Superior Court in Maricopa County
No.  LC2016-000505-001
The Honorable Dawn M. Bergin, Judge *Retired*

**VACATED AND REMANDED**

COUNSEL

Dentons US, LLP, Phoenix
By Paul K. Charlton, Karl M. Tilleman, Douglas D. Janicik
*Co-Counsel Plaintiff/Appellee/Cross Appellant Ronald A. Simms*

Greenberg Traurig, LLP, Phoenix
By Nicole M. Goodwin
*Co-Counsel for Plaintiff/Appellee/Cross Appellant Ronald A. Simms*

Orrick Herrington & Sutcliffe, LLP, Los Angeles, California
By Stacy W. Harrison, Nathan J. Novak
*Co-Counsel for Plaintiff/Appellee/Cross Appellant Ronald A. Simms*

Stinson, LLP, Phoenix
By Michael C. Manning, James M. Torre
*Counsel for Defendants/Appellants/Cross Appellees Jeremy E. Simms, TP Racing
LLLP, Bell Racing LLC*

Gammage & Burnham, PLC, Phoenix
By Camila Alarcon, Christopher L. Hering
*Counsel for Defendant/Appellant/Cross Appellee Arizona Racing Commission*

---

## OPINION

Presiding Judge David D. Weinzweig delivered the opinion of the Court, in which Judge Jennifer M. Perkins and Judge James B. Morse Jr. joined.

---

**W E I N Z W E I G**, Judge:

¶1      This appeal marks another chapter in the protracted and acrimonious feud between brothers Jeremy ("Jerry") and Ronald ("Ron") Simms over the rights to Turf Paradise. Their fraternal animus has spawned a vast web of administrative duels, lawsuits and appeals. This chapter requires us to decide when the Arizona Racing Commission may accept and decide appeals of licensing decisions made by the Arizona Department of Gaming's director.

### FACTS AND PROCEDURAL BACKGROUND

¶2      We recount the facts in the "light most favorable to the Commission's decision." *DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331, 334 (App. 1984).

### A.      Turf Paradise and the Simms Brothers

¶3      Turf Paradise is a thoroughbred and quarter horse racetrack located about 25 miles from downtown Phoenix. Jerry and Ron acquired Turf Paradise in 2000 through a limited partnership, TP Racing, L.L.L.P. ("TPR"). Jerry held a 55 percent interest in TPR; Ron and Ron's trust held a 32 percent interest. Jerry and Ron formed J & R Racing, LLC ("J & R") to serve as TPR's general partner, imbued with exclusive authority to manage TPR's affairs. Jerry and Ron each owned a 50 percent interest in J & R. Ron owned his through RASCD, Inc.

¶4      Jerry and Ron's business relationship deteriorated and then disintegrated, ending in a pair of 2010 lawsuits asserting competing claims and counterclaims. Jerry and TPR sued Ron and one of Ron's corporations for defaulting on a promissory note associated with a land transfer. Ron responded with 40 counterclaims, including claims for breach of contract and breach of fiduciary duty. The superior court issued two injunctions in

those lawsuits; the first prevented Jerry from exceeding his managerial authority under J & R's operating agreement, *Simms v. Simms*, 1 CA–CV 11–0525, 2012 WL 2795978 (Ariz. App. July 3, 2012); the second prevented Jerry from removing J & R as TPR's general partner without justification, *TP Racing, L.L.L.P. v. Simms*, 232 Ariz. 489 (App. 2013).

### B.     Ron Loses His License and Is Ousted

**¶5**          The quarrel then shifted to the administrative arena. TPR asked the Arizona Department of Racing ("ADOR") to renew its three-year racing permit in 2012. During the renewal process, ADOR Director Bill Walsh learned that Ron's individual racing license had expired and ordered that Ron "may not take part in, directly or indirectly, or have any personal interest in the operation of [TPR]." Director Walsh said ADOR was concerned about Ron's "fitness" to participate in TPR and promised to "thoroughly scrutinize[]" Ron's future license applications. Years later, the superior court in this case would receive evidence that Jerry sparked or stoked Ron's regulatory troubles by delivering ten binders of adverse information to Director Walsh.

**¶6**          Ron formally applied for a new racing license in November 2013. Unbeknownst to Ron, Director Walsh decided to deny Ron's application and solicited input from Jerry's attorney in drafting the "notice of denial." Jerry's attorney was pleased with Director Walsh's draft and privately praised him for an "A+ job." Director Walsh's final notice of denial listed ten grounds for rejecting Ron's application. Walsh also warned that TPR's "application for renewal of its three year permit" would be considered only after Ron was removed from any role in or connection to the business.

**¶7**          Given the denial of Ron's application, the superior court dissolved both injunctions against Jerry and TPR. Just hours later, the TPR partners (absent Ron) voted to dissociate Ron from TPR and replace J & R as general partner with Bell Racing, a new company Jerry had formed. Jerry assumed control of Turf Paradise with these maneuvers, at least for the time being.

### C.     The Office of Administrative Hearings, Arizona Department of Gaming and Arizona Racing Commission

**¶8**          Ron appealed the denial of his racing license. *See* A.R.S. § 5-104(D). The Office of Administrative Hearings held a 21-day hearing over ten months before an administrative law judge ("ALJ"). In June 2015, the ALJ recommended that Director Walsh's decision be reversed and Ron be

issued a racing license. Among his findings and conclusions, the ALJ determined that Ron was "qualified to be licensed by ADOR," "has sufficient good repute and moral character to satisfy the statutory requirement for a license," and "did not violate the racing laws" or the Commission's regulations "when he was previously licensed or granted a permit."

¶9        At that point, Arizona law required "the director" to reject or modify the ALJ's decision. *See* A.R.S. § 5-104(D) ("The decision of the administrative law judge becomes the decision of the director unless rejected or modified by the director within thirty days."). Two weeks after the ALJ's decision, however, the legislature refashioned ADOR into a division of the Arizona Department of Gaming ("ADOG"). This administrative shuffle meant that ADOG's director considered the ALJ's decision rather than Director Walsh. The ALJ's decision then became ADOG's final decision (hereinafter, the "ADOG Decision") because ADOG's director did not reject or modify the ALJ's decision "within thirty days" after its release. *See id.*

¶10        Jerry and TPR appealed the reversal of Ron's license denial to the Commission under A.R.S. § 5-104(D), urging the Commission to "reject and reverse" the ADOG Decision "pursuant to Ariz. Admin. Code R9-2-124(A), A.R.S. § 5-104(D), and A.R.S. § 41-1092.08(C)." Ron moved to dismiss the appeal for lack of "standing," arguing that neither Jerry nor TPR was a "person aggrieved" under the Commission's rules. *See* Ariz. Admin. Code R19-2-124(A)(1). The Commission rejected Ron's argument, voting 3-2 that Jerry and TPR had "aggrieved person status."

¶11        The Commission held a hearing and received extensive briefing from the parties before reversing the ADOG Decision, again "denying [Ron] an owner's license to participate in or be employed at any horse race track licensed to operate in the State of Arizona." The Commission found that Ron did "not have sufficient good repute and moral character to satisfy the statutory requirement for a license and that granting [Ron] a license would not serve the best interest of the safety, welfare, economy, health and peace of the people of the State." *See* A.R.S. § 5-108(A)(1)(b), (h). The Commission also found that Ron violated Arizona's racing laws when he was previously licensed, A.R.S. § 5-108(A)(1)(c); willfully violated the Commission's rules and regulations, A.R.S. § 5-108(A)(1)(g); knowingly made false statements of fact to ADOR, A.R.S. § 5-108(A)(3); did not meet "his monetary obligations in connection with racing meetings," A.R.S. § 5-108(A)(4); and failed to inform ADOR in writing of material changes in his license application, A.R.S. § 5-108(A)(1)(j).

### D. The Superior Court

¶12 Ron timely appealed the Commission's decision to the superior court, raising 25 procedural, evidentiary and constitutional arguments. *See* A.R.S. §§ 41-1092.08(H), 12-905(A). As relevant here, Ron argued that the Commission erred by hearing Jerry and TPR's appeal because neither had standing as "persons aggrieved," that ADOR and the Commission deprived Ron of due process and equal protection in the first instance, and that the Commission's decision was unsupported by sufficient evidence.

¶13 The superior court heard oral argument. It also reviewed written memoranda, the administrative record and supplemental evidence of the parties, but held no evidentiary hearing. *See* A.R.S. § 12-910(A), (B). The court then vacated the Commission's decision and reinstated the ADOG Decision, reasoning that Jerry and TPR did not "qualify as aggrieved persons" under R19-2-124(A)(1). The court did not define the term "person aggrieved," but rejected the dictionary "definition of 'aggrieved' [as] entirely too broad and therefore unworkable," and found the Commission's rule "is not designed" to resolve or "delve into whatever disputes exist between the partners."

¶14 Because it vacated and reversed the Commission's decision on standing grounds, the superior court did not decide whether the Commission erred on the merits or violated Ron's constitutional rights. The court did, however, reject Ron's due process arguments against former ADOR Director Walsh, reasoning that Ron had no constitutionally protected property interest in a racing license and that "Walsh was not acting in a quasi-judicial capacity when he denied Ron's license." Ron sought nearly $11 million in attorney fees and costs, which the court described as "patently unreasonable" and awarded Ron $225,000 in fees and costs.

¶15 The Commission, Jerry, Ron and TPR timely appealed and cross-appealed, asserting errors at every stage of the licensure process, beginning with former Director Walsh's original denial and ending with the superior court's reversal of the Commission's decision. We have jurisdiction. *See* A.R.S. § 12-913.

## DISCUSSION

¶16 The superior court determined that Jerry and TPR lacked standing to appeal the ADOG Decision to the Commission. Arizona courts, however, are "not constitutionally constrained" to impose standing

minimums, and this case does not present the doctrine of prudential standing, which cautions Arizona courts to "exercise restraint [and] refrain from issuing advisory opinions" to ensure that "cases [are] ripe for decision" and "issues [are] fully developed between true adversaries." *City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, 209, ¶8 (2019).

**¶17**　　　Even so, the Commission must follow the administrative rules it promulgates, including limitations on who may appeal rulings to the Commission. *Cochise Cty. v. Ariz. Health Care Cost Containment Sys.*, 170 Ariz. 443, 445 (App. 1991) ("An administrative agency must follow the rules it promulgates."); *cf. Ariz. Dep't of Water Res. v. McClennen*, 238 Ariz. 371, 376, ¶ 29 (2015) (distinguishing the concept of standing from "the question of who is statutorily authorized, as an 'interested person,' to file objections in an ADWR administrative proceeding").

**¶18**　　　At issue here is Arizona Administrative Code R19-2-124(A)(1), "Appeal of Director's Rulings," which provides:

> A person aggrieved by a ruling of the Director may appeal to the Commission. An appeal shall be filed in writing to the office of the Commission within 30 days after service of the Director's ruling.

**¶19**　　　Arizona courts interpret the Commission's rules de novo, using the standard rules and tools of statutory construction. *Saguaro Healing LLC v. State*, 249 Ariz. 362 (2020). The "fundamental purpose" of this exercise is to ascertain the Commission's intent. *Marlar v. State*, 136 Ariz. 404, 410-411 (App. 1983). We accord no "deference to any previous determination that may have been made on the question by the [Commission]." A.R.S. § 12-910(E).

**¶20**　　　We must determine what the Commission meant when it issued R19-2-124(A)(1), limiting prospective challengers to "person[s] aggrieved," and then we must decide whether Jerry and TPR so qualified. At the outset, we recognize that "person aggrieved" is ambiguous here because the Commission never defines it and the term is "subject to more than one reasonable meaning." *See McClennen*, 238 Ariz. at 375, ¶ 24. For several reasons, however, we hold that Jerry and TPR were "person[s] aggrieved" under the Commission's regulations.

**¶21**　　　First, we interpret the Commission's administrative rules to "further the statutory policy" contained in its enabling statute. *See Cooke v. Ariz. Dep't of Econ. Sec.*, 232 Ariz. 141, 144, ¶ 13 (App. 2013) (quoting *Marlar*, 136 Ariz. 404, 411 (App. 1983)). The legislature created the Commission to

"protect and promote public health, safety and the proper conduct of racing and pari-mutuel wagering." A.R.S. § 5-104(A)(2). The legislature broadly authorized the Commission to "hear any appeal of a decision of the [ADOG] director" and imbued the Commission with ultimate control to "approve or reject [the director's] decisions." *See* A.R.S. § 5-104(B) ("The director is subject to ongoing supervision by the commission, and the commission may approve or reject decisions of the director in accordance with rules established by the commission."); *see also* A.R.S. § 5-104(D) ("The commission may hear any appeal of a decision of the director in accordance with [the Uniform Administrative Hearing Procedures Act].").

**¶22** A broad definition of "person aggrieved" is therefore appropriate to ensure the Commission receives the information and opportunity it requires to discharge its codified job description. *See Goodman*, 136 Ariz. at 205 (the legislature intended for the Commission "to strengthen the regulation of the racing industry in Arizona"). A narrow interpretation, by contrast, would diminish the Commission's plenary statutory authority, possibly shielding an ADOG director's licensing decisions from Commission scrutiny. *See Goodman*, 136 Ariz. at 205 (the legislature intended for the Commission "to strengthen the regulation of the racing industry in Arizona").

**¶23** Long ago, our supreme court interpreted the identical phrase "person aggrieved" in a comparable administrative context. *Mendelsohn v. Superior Court*, 76 Ariz. 163, 166 (1953). At issue there was a statute authorizing only a "person aggrieved" to appeal the issuance of a liquor license. *Id.* at 166. At the outset, the court recognized that "person aggrieved" has no meaning "[a]part from its syntactical and sociological setting." *Id.* at 166 (addressing transfer of liquor license and noting, "There is nothing intrinsic and peculiar to the phrase, qua phrase, that leads one unwaveringly to one conclusion or the other."). With that backdrop, the court declined to limit "the right of appeal to the applicant while denying it to the citizens" because that interpretation "would run counter to the spirit of strict regulation permeating the whole of the Act." *Id.* at 170.

**¶24** So too here. Arizona's strict regulation of gaming and horse racing likewise supports greater Commission oversight and a more robust definition of "person aggrieved" to "assur[e] ample opportunity for investigation of the qualifications of the applicant and the exigencies of the public." *Mendelsohn*, 76 Ariz. at 169.

**¶25** Second, a narrow definition of "person aggrieved" would conflict with the Commission's other rules, which describe and contemplate

an expansive regulatory role. *See* A.A.C. R19-2-101(E) ("The Commission may sustain, reverse, or modify *any* penalty or decision imposed by the Director." (emphasis added)); A.A.C. R19-2-124(A)(3) ("When an appeal is filed, the Commission *shall* review the record and may affirm, reverse, or modify the Director's ruling or conduct other proceedings the Commission deems appropriate." (emphasis added)). These "statutorily authorized regulation[s] [are] unambiguous [and] 'we apply [them] without further analysis.'" *See Silver v. Pueblo Del Sol Water Co.*, 244 Ariz. 553, 558, ¶ 16 (2018) (quoting *Glazer v. State*, 237 Ariz. 160, 163, ¶ 12 (2015)).

¶26 Third, although "person aggrieved" is undefined, the Commission's rules broadly define "person" to include owners, nominators, lessees and lessors. R19-2-102(30), (38), (44). Just as important, by using "person aggrieved," rather than "applicant aggrieved" or "party aggrieved," the Commission intended a "broader" pool of prospective challengers, beyond "only a person whose application had been denied." *See Mendelsohn*, 76 Ariz. at 169-170. "Had the [Commission] meant to limit the right [to appeal] . . . it could have used, and doubtless would have used, a more limited term." *Id.* For instance, the word "applicant" appears over 100 times in the Commission's rules. Furthermore, the Commission limits who may appeal the director's "final decision concerning a breeder's award" to an "aggrieved party." R19-2-116(D)(10) (also titled "Appeal of Director's Rulings").

¶27 Jerry and TPR also contend they were "aggrieved" because Ron's licensure troubles threatened TPR's then-pending application to renew its racing permit. *See, e.g.*, A.R.S. §§ 5-108(A)(2)(e) (Commission may decline to renew an organization's racing permit if substantial evidence exists that its owners, "officers, managerial employees, directors or substantial stockholders have[] committed acts of moral turpitude in this state or have willfully violated a material racing statute of this state or a material rule or regulation of the commission"); -108.05(C) (authorizing revocation of license held by an organization "controlled or operated directly or indirectly by" a person who violates A.R.S. § 5-115). On this record, however, the inverse appears true. Once Ron's license was reinstated, TPR could renew its racing permit and move forward.

¶28 More compelling, however, Jerry and TPR assert a genuine, specific interest in vacating/reversing the reinstatement of Ron's license. They contend Ron has already used the reinstatement decision as a sword in court, claiming it proves that Jerry and TPR engaged in fraud. They also argued to the Commission that Ron had commenced a court proceeding with his license reinstated to remove Jerry from TPR's management,

dissolve the company and sell its assets, including Turf Paradise. These allegations would support the Commission's determination that Jerry and TPR were "person[s] aggrieved" by the ADOG Decision. *See Aggrieved*, Black's Law Dictionary (11th ed. 2019) (listing definitions for "aggrieved," including "having legal rights that are adversely affected," "having been harmed by an infringement of legal rights," "angry or sad on grounds of perceived unfair treatment"). In sum, Jerry and TPR qualify as "person[s] aggrieved" under the Commission's rules.[1]

### A.    Due Process Claims—Former Director Walsh

**¶29**        The superior court rejected Ron's due process claim against the Commission based on former Director Walsh's conduct, finding that (1) Ron had no constitutionally "protectable property interest" in a license he "seek[s] but do[es] not have," and (2) "Walsh was not acting in a quasi-judicial capacity when he denied Ron's license."

**¶30**        Ron contends this was error. We need not reach the merits of his argument, which is moot because Ron already received a fair and impartial hearing before the ALJ. *BT Capital, LLC v. TD Serv. Co. of Ariz.* 229 Ariz. 299, 300-01, ¶ 9 (2012) ("[A] case becomes moot when an event occurs which would cause the outcome of the appeal to have no practical effect on the parties.") (quoting *Sedona Private Prop. Owners Ass'n v. City of Sedona*, 192 Ariz. 126, 127, ¶ 5 (App. 1998)); *see Horne v. Polk*, 242 Ariz. 226, 234 (2017) (holding that the proper remedy for a due process violation based on bias is a new "determination by a neutral decision maker"). Ron seeks to defend the ALJ's decision here.

---

[1]        Ron cites *McClennen*, 238 Ariz. 371, for the proposition that "person aggrieved" is a "term of art recognized by courts as narrowing the field of prospective applicants to those who fall within the relevant statute's 'zone of interest.'" But the supreme court in *McClennen* applied fundamental principles of statutory construction, as we do here. Indeed, the court distinguished the concept of "standing" from "the question of who is statutorily authorized, as an 'interested person,' to file objections in an [Arizona Department of Water Resources'] administrative proceeding under § 45–172(A)." 238 Ariz. at 376, ¶ 29. Beyond that, *McClennen* never mentioned, much less applied, the "zone of interest" test.

### B.    Attorney Fees

**¶31**         We vacate the superior court's award of attorney fees against the Commission because Ron has not "prevail[ed] by an adjudication on the merits."   A.R.S. § 12-348(A); *accord Horne v. Polk*, 242 Ariz. 226, 234, ¶ 31 (2017).  We likewise deny Ron's request for attorney fees on appeal under A.R.S. § 12-348(A)(2).  Jerry and TPR did not request fees and costs.

### CONCLUSION

**¶32**         For the reasons set forth above and in our separate memorandum decision, *see* Ariz. R. Sup. Ct. 111(g), (h), we vacate the superior court's order and remand for further proceedings consistent with this opinion and the decision.

