IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

RONALD A. SIMMS, *Plaintiff/Appellant/Cross-Appellee,*

and

ARIZONA DEPARTMENT OF GAMING, *Defendant/Appellee,*

*v.*

JEREMY E. SIMMS, et al., *Defendants/Appellees/Cross-Appellants.*

No. 1 CA-CV 23-0139
FILED 03-18-2025

Appeal from the Superior Court in Maricopa County
No. LC2016-000505-001
The Honorable Timothy J. Thomason, Judge, *Retired*

**VACATED AND REMANDED**

COUNSEL

Stinson LLP, Phoenix
By James M. Torre, Michael Vincent
*Co-Counsel for Defendants/Appellees/Cross-Appellants TP Racing, LLLP, Jeremy E. Simms, and Bell Racing, LLC*

Michael C. Manning, PLLC, Phoenix
By Michael C. Manning
*Co-Counsel for Defendants/Appellees/Cross-Appellants TP Racing, LLLP, Jeremy E. Simms, and Bell Racing, LLC*

Law Offices of Thomas A. Zlaket, PLLC, Tucson
By Thomas A. Zlaket
*Co-Counsel for Plaintiff/Appellant/Cross-Appellee Ronald A. Simms*

Cole Pedroza, LLP, San Marino, CA
By Nathan J. Novak
*Co-Counsel for Plaintiff/Appellant/Cross-Appellee Ronald A. Simms*

Greenberg Traurig, LLP, Phoenix
By Dominic Emil Draye, Matthew P. Hoxsie
*Co-Counsel for Plaintiff/Appellant/Cross-Appellee Ronald A. Simms*

Ballard Spahr, LLP, Phoenix
By John G. Kerkorian, Michael Stephen Myers
*Counsel for Defendant/Appellee Arizona Department of Gaming*

Gammage & Burnham, PLC, Phoenix
By Christopher L. Hering, Jacqueline E. Marzocca
*Counsel for Defendant/Appellee/Cross-Appellant Arizona Racing Commission*

Pacific Legal Foundation VA, Arlington, VA
By Aditya Dynar
*Counsel for Amicus Curiae Pacific Legal Foundation*

Arizona State University, Phoenix
By Ilan Wurman
*Counsel for Amicus Curiae Ilan Wurman*

---

**OPINION**

Judge Michael S. Catlett delivered the opinion of the Court, in which Presiding Judge Angela K. Paton and Judge James B. Morse Jr. joined.

---

**C A T L E T T,** Judge:

¶1        Arizona law now instructs courts to withhold deference to administrative agencies on questions of law and fact when reviewing agency action involving regulated parties.  In 2018, the legislature amended the statute governing judicial review such that, in regulated-party proceedings, courts decide questions of law without deference.  A.R.S. § 12-910(F); 2018 Ariz. Sess. Laws, ch. 180, § 1 (2d Reg. Sess.) (H.B. 2238).  Three years later, the legislature again amended that statute such that, in regulated-party proceedings, courts decide questions of fact without deference.  2021 Ariz. Sess. Laws, ch. 281, § 1 (1st Reg. Sess.) (S.B. 1063). This court has not—until now—fleshed out these changes.

¶2        This is the latest chapter in a feud between brothers Ronald Simms ("Ron") and Jeremy Simms ("Jerry") over Turf Paradise, a horse-racing track in Phoenix.  In 2013, Ron asked the Arizona Department of Racing ("Racing Department") for a racing license.  The Racing Department denied that request.  Ron appealed to an Administrative Law Judge ("ALJ").  He recommended Ron receive a license.  The Arizona Department of Gaming ("Gaming Department") accepted that recommendation.  Jerry then appealed to the Arizona Racing Commission ("the Commission"), which denied a license after concluding Ron lied to the Racing Department. The parties then traveled to the superior court, this court, the supreme court, and back to the superior court.  They now return here after the superior court affirmed the Commission's decision.  Applying the new framework for reviewing agency action, we vacate and remand to enter judgment for Ron.

**FACTS AND PROCEDURAL HISTORY**

**I.**

¶3        Turf Paradise is a thoroughbred and quarter-horse racetrack in Phoenix.  In 2000, a group of investors including Ron and Jerry acquired

Turf Paradise through TP Racing, L.L.L.P. ("TP Racing"). Jerry and Ron formed J & R Racing, LLC to manage TP Racing's affairs.

¶4 Jerry and Ron bought most of the land under Turf Paradise through their entities, J. Simms Enterprises (Jerry) and Bruin Corp. (Ron). For partnership in TP Racing, Ron and Jerry had those entities lease that land to TP Racing. Neither Jerry nor Ron contributed any actual capital.

¶5 In May 2000, the Racing Department's then-director issued horse-racing licenses to Jerry and Ron and a racing permit to TP Racing. Later that year, the Governor replaced that director after the Arizona Republic ran a story about Jerry's business dealings in California.

¶6 The Racing Department's new director then further investigated TP Racing's capital structure and land ownership. As a result, the Racing Department required Jerry to own 50% of TP Racing, as its managing partner. During that investigation, the Racing Department acknowledged that "unlicensed entities" owned land under the racetrack. To remedy that issue, the Racing Department asked that "land currently held by Bruin Corporation and J. Simms Enterprises LLC necessary" for racing "be transferred without encumbrance to [TP Racing]."

¶7 For tax reasons, Jerry and Ron could not deed that land to TP Racing. Instead, they signed notes payable equal to the land's purchase price. Those notes were their capital contributions, but Jerry and Ron could pay off the notes by transferring the land to TP Racing.

¶8 Three years later, the Racing Department reviewed TP Racing's permit. During that review, Jerry and Ron agreed to transfer all land under the racetrack to TP Racing. Specifically, Jerry would transfer J. Simms Enterprises, LLC's land to pay off his $14 million note to TP Racing. That transaction would replace "a note (for which no payment was likely to be demanded by [TP Racing]) with real estate essential to its operations." TP Racing would give Bruin Corp. non-essential land in return for land under the track. Consistent with those plans, Jerry had J. Simms Enterprises, LLC give its land under the track to TP Racing to pay off his note, and Ron had Bruin Corp. trade its land under the track for land elsewhere under Turf Paradise. Because Bruin Corp. swapped one piece of land for another, Ron still owed on his note.

¶9 Things remained peaceful for seven years. But that changed in 2010, when Jerry complained that Ron had not paid off his note with Bruin Corp.'s land. Jerry wrote that "[i]f you recall, all of us agreed and expected that the land I utilized for a 1031 exchange as well as the land you

4

utilized for a 1031 exchange would ultimately be . . . rolled into Turf Paradise. I did that. So far you have not." Jerry also recounted that "[a]ll that was ever contemplated [was] that the track would own the property," and "[t]hen the track would not have to worry about collecting a $4,635,000 note from you." Finally, Jerry thought Ron "had the best of both worlds" because if Bruin Corp.'s property value increased, Ron could pay off the note, and if it decreased, Ron could "roll" the property into TP Racing. Ron claims he then offered Bruin Corp.'s land to pay off his note, but Jerry "responded with a host of new and extortionate conditions," which Ron refused.

¶10        Litigation ensued, including two lawsuits and two injunctions against Jerry. *See Simms v. Simms*, 2012 WL 2795978, at *1 ¶ 1 (Ariz. App. July 3, 2012) (mem. decision) (enjoining Jerry from exceeding his managerial authority); *TP Racing, L.L.L.P. v. Simms*, 232 Ariz. 489, 492 ¶¶ 5–6 (App. 2013) (enjoining Jerry from removing TP Racing's general partner without justification); *see also Simms v. Rayes*, 234 Ariz. 47 (App. 2014); *T.P. Racing L.L.L.P. v. Simms*, 2016 WL 423803 (Ariz. App. Feb. 4, 2016) (mem. decision).

## II.

¶11        In 2012, TP Racing asked to renew its permit. During that process, the Racing Department's Director, Bill Walsh, discovered that Ron's license had expired. But that discovery was no happenstance. Instead, there was "evidence that Jerry sparked or stoked Ron's regulatory troubles by delivering ten binders of adverse information to Director Walsh." *Simms v. Ariz. Racing Comm'n*, 253 Ariz. 214, 216 ¶ 5 (App. 2022). Because Ron lacked a license, Director Walsh ordered that he "not take part in, directly or indirectly, or have any personal interest in the operation of [TP Racing]." *Id.* And he threatened to closely scrutinize Ron's future applications. *Id.*

¶12        Undeterred, Ron applied for a license. The Racing Department denied that request, but only after input from Jerry's counsel. In so doing, the Racing Department relied on statements Ron made to the Racing Department thirteen years earlier and his alleged failure to disclose exactly how he could pay off his note to TP Racing. Without a license, the Racing Department warned Ron that he could no longer participate in TP Racing.

¶13        That effectively ended Ron's involvement in TP Racing. The superior court dissolved the injunctions against Jerry, and TP Racing's

partners dissociated Ron. They instead installed Bell Racing (a new entity Jerry formed) as TP Racing's general partner. "Jerry assumed control of Turf Paradise with these maneuvers, at least for the time being." *Id.* ¶ 7.

**III.**

¶14 Ron appealed to the Office of Administrative Hearings. It assigned an ALJ, who held a 21-day hearing. *See* A.R.S. § 5-104(D). The ALJ issued a 23-page decision recommending that Ron receive a license. The ALJ found that Ron truthfully testified that he told the Racing Department that he could pay off his note with cash or by giving land to TP Racing. In other words, the Racing Department knew Ron could pay off his note with Bruin Corp.'s land. Regarding Bruin Corp., the ALJ found that, until 2006, Ron incorrectly told the Racing Department that his wife owned Bruin Corp. But the ALJ found Ron truthfully explained his misstatements, so they were not knowingly false.

¶15 In July 2015, the legislature moved the Racing Department under the Gaming Department. 2015 Ariz. Sess. Laws, ch. 19, § 2 (1st Reg. Sess.) (S.B. 1480). As a result, the Gaming Department's director—not Director Walsh—considered the ALJ's recommendation. After the Gaming Department left the ALJ decision untouched for 30 days, it became the Gaming Department's decision ("Gaming Decision"). *See* A.R.S. § 5-104(D).

**IV.**

¶16 Jerry and TP Racing appealed to the Racing Commission. It allowed briefing on whether to uphold the Gaming Decision. Later, all the racing commissioners but one voted to deny Ron a license.

¶17 In its decision, the Commission modified five of the ALJ's factual findings and four of his legal conclusions, and it added its own legal conclusion. The Commission found that, until 2006, Ron said his wife owned Bruin Corp. After 2006, though, Ron admitted he owned Bruin Corp. The Commission acknowledged that, even after Ron told the Department he owned Bruin Corp., the Department raised no concern for seven years. But to explain that indifference, the Commission said the Racing Department thought Bruin Corp.'s only relationship to TP Racing was that of a landlord leasing non-essential land, so Ron's wife did not need a license. The Commission reversed the ALJ's finding that Ron truthfully explained why he said his wife owned Bruin Corp. But the Commission did not decide "who, in fact, owned Bruin from 2000 to 2006."

¶18 The Commission then addressed whether Ron disclosed how he could pay off his note to TP Racing. The Commission again reversed the ALJ's credibility finding. It found that Ron's "testimony regarding the conversation with [Racing Department] representatives in 2000" was not credible because Ron "presented no extrinsic evidence or witness testimony corroborating" that testimony. The Commission concluded that Ron provided "no credible evidence" supporting that the Racing Department knew that "the makers of the promissory notes" (Jerry and Ron) could pay off their notes with land. But the Commission did not decide whether Ron and Jerry agreed Ron could pay off his note that way.

¶19 Based on its findings, the Commission concluded that Ron lied to the Racing Department and did not tell it about material changes in the information he provided "in the application for a license or permit." The Commission also concluded Ron did not show that he "met his monetary obligations in connection with racing meetings held in this State." So the Commission denied Ron a license.

¶20 Vice Chair Feldmeier dissented. He thought it was "important to retain" the ALJ's decision for six reasons, including that "after the lengthy hearing . . . [the ALJ] provided numerous reasons why [Ron] should receive" a license. He thought Bruin Corp.'s ownership became irrelevant when Ron admitted ownership in 2006, and that ownership only became relevant again when Jerry encouraged Director Walsh to deny Ron a license. And he stated, "this has been a witch hunt all along, and it's about [Jerry] doing whatever he can to prevent [Ron] from getting his license. That's what it comes down to."

### V.

¶21 Ron appealed to the superior court, arguing Jerry and TP Racing lacked standing to challenge the Gaming Decision. Ron also claimed the Commission did not give him due process, and the record did not adequately support the Commission's licensing decision. The superior court sided with Ron, concluding Jerry and TP Racing lacked standing. Jerry, TP Racing, and the Commission ("Commission Parties") appealed.

¶22 This court vacated and remanded. In doing so, this court concluded Jerry and TP Racing had standing because they were "'person[s] aggrieved' under the Commission's rules." *Simms*, 253 Ariz. at 220 ¶ 28. It then rejected part of Ron's due process claim based on Jerry's *ex parte* contacts with Director Walsh, explaining "Ron already received a fair and impartial hearing before the ALJ." *Id.* ¶ 30. It then remanded Ron's due

process claim because it could not "meaningfully consider the issues on this record." *Simms v. Ariz. Racing Comm'n*, 2022 WL 1256594, *1 ¶ 4 (Ariz. App. Apr. 28, 2022) (mem. decision). With that conclusion, this court did not address Ron's merits challenge to the licensing decision. *Id.*

### VI.

**¶23** Back in the superior court, the parties briefed Ron's due process claim and his claim challenging the licensing decision. But the court rejected both. It concluded Ron did not carry his "substantial burden of showing the facts presented rise to the level of a" due process violation. And it rejected his challenge to the licensing decision. In so doing, the court viewed the "evidence in the light most favorable to affirming the Commission's decision" and asked whether substantial evidence supports it. After concluding substantial evidence supported the Commission's decision, the court affirmed.

**¶24** Ron appeals, and the Commission Parties cross-appeal. We have jurisdiction. *See* A.R.S. § 12-913.

### DISCUSSION

**¶25** Ron raises two main challenges. One, he challenges the Commission's decision denying a license, asking us to reverse based on the judicial review standards in § 12-910(F) (we call that subsection "910(F)"). Two, he challenges whether the Commission gave him due process. In their cross-appeal, the Commission Parties argue the superior court erred in concluding the Commission must provide due process when resolving new license requests. Because we decide the licensing issue against the Commission Parties, we do not address the parties' due process arguments.

### I.

**¶26** Ron argues the superior court erred by reviewing the Commission's decision for substantial evidence. For example, the court thought it "must consider whether" substantial evidence supported "the Commission's reasons for denying Ron's license," but it also said it would "not give deference to any factual finding" the Commission made. To Ron, that "makes no sense." Instead, he suggests reviewing courts no longer defer to agencies in any respect; instead, they adopt the ALJ's factual findings so long as substantial evidence supports them.

**¶27** For their part, the Commission Parties urge that reviewing courts review agency decisions for substantial evidence. Because the

agency decision here is the Commission's decision, they argue we must review it, not the ALJ's decision, for substantial evidence. They posit that whether substantial evidence exists is a legal question, so the amendment eliminating deference to agency factfinding is inapplicable. And they assert that substantial evidence supports the Commission's factual findings and its decision.

¶28     Neither side is quite right. On one hand, the Commission Parties are correct that the agency decision here is the Commission's decision, not the ALJ's. But they are incorrect that we review the Commission's decision for substantial evidence and that the amendments to 910(F) play no role. On the other hand, Ron is correct that 910(F) now says reviewing courts do not defer when "the regulated party" raises fact questions, which applies here. But Ron is mostly incorrect that reviewing courts instead defer to ALJ factual findings.

## A.

¶29     The amendments to 910(F) reshaped how courts review agency action. To explain in what way, we recount how judicial review worked before those amendments and how it works now.

### 1.

#### a.

¶30     Before 2018, reviewing courts would sometimes defer to an agency's legal interpretations. *See, e.g.*, *Marlar v. State*, 136 Ariz. 404, 411 (App. 1983); *Indus. Comm'n v. Harbor Ins. Co.*, 104 Ariz. 73, 76 (1968). To be sure, courts often said that "the ultimate responsibility for interpreting a statute or regulation rests with the courts[.]" *Marlar*, 136 Ariz. at 411. And "[w]hen an administrative decision [was] based on an interpretation of law, we [would] review it *de novo*." *Saldate v. Montgomery*, 228 Ariz. 495, 498 ¶ 10 (App. 2012) (citation omitted). But courts occasionally deferred. For example, our supreme court once said that "the construction placed on a statute by the executive body which administers it, if acquiesced in for a long period of time, will not be disturbed unless such construction is manifestly erroneous." *Harbor Ins.*, 104 Ariz. at 76. Similarly, this court said an agency's interpretation of a regulation it implements is "entitled to great weight." *Marlar*, 136 Ariz. at 411.

**b.**

¶**31**        Now, in regulated-party cases, reviewing courts do not defer to an agency's legal interpretations.  As 910(F) puts it, "[i]n a proceeding" involving "the regulated party," courts "decide all questions of law." Questions of law include "the interpretation of a constitutional or statutory provision or a rule adopted by an agency[.]"  A.R.S. § 12-910(F).  And reviewing courts no longer defer even when an agency has interpreted a statute or regulation in the same way for a long time.  *Id.* (instructing courts to decide "all" legal questions "without deference to any previous determination that may have been made on the question by the agency"); *see also Batty v. Ariz. Med. Bd.*, 253 Ariz. 151, 154 ¶ 11 (App. 2022).  Put differently, reviewing courts have the final say on what the law is.

**2.**

**a.**

¶**32**        Before 2021, courts were highly deferential when reviewing fact questions under 910(F).  *See e.g., Gaveck v. Ariz. State Bd. of Podiatry Exam'rs*, 222 Ariz. 433, 436 ¶ 11 (App. 2009); *Horne v. Polk*, 242 Ariz. 226, 230 ¶ 13 (2017).  Reviewing courts had to "defer to the agency's factual findings and affirm them if supported by substantial evidence."  *Gaveck*, 222 Ariz. at 436 ¶ 11 (citing *Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs*, 202 Ariz. 555, 557 ¶ 7 (App. 2002)); *Horne*, 242 Ariz. at 230 ¶ 13 ("The court affirms the agency's factual findings if they are supported by substantial evidence[.]"). That meant reviewing courts would affirm if, viewing the facts favorably to the agency, there was "evidence which would permit a reasonable person to reach the [agency's] result."  *Sierra Club – Grand Canyon Ch. v. Ariz. Corp. Comm'n*, 237 Ariz. 568, 575, ¶ 22 (App. 2015) (citation omitted); *Hirsch v. Ariz. Corp. Comm'n*, 237 Ariz. 456, 459 ¶ 2 n.2 (App. 2015).  And courts had to affirm agency findings even "if either of two inconsistent factual conclusions [were] supported by the record."  *E. Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n*, 206 Ariz. 399, 409 ¶ 35 (App. 2003) (citing *DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331, 336 (App. 1984)).  Under those standards, the agency almost always won.

**b.**

¶**33**        Section 910(F) now instructs that "[i]n a proceeding brought by or against the regulated party, the court shall decide all questions of fact without deference to any previous determination that may have been made on the question by the agency."  This means what it says — reviewing courts no longer defer on fact questions in proceedings involving "the regulated

party." A.R.S. § 12-910(F). As we recently explained, "Arizona's courts have afforded deference to the factual findings of an administrative agency. But the legislature has now indicated otherwise[.]" *Batty*, 253 Ariz. at 155 ¶ 11 n.2 (internal citations omitted); *see also Marsh v. Atkins*, 256 Ariz. 233, 236 ¶ 10 (App. 2023) ("[I]n reviewing the evidence, no deference can be given to the agency's factual findings.").

¶34 Applying the new language, when a regulated party challenges agency factual findings, reviewing courts no longer review for substantial evidence. *See* A.R.S. § 12-910(F). They instead review "the administrative record and supplementing evidence," and determine independently whether the required quantum of evidence (usually, a preponderance of the evidence) supports a challenged factual finding. *Id.* Reviewing courts no longer ask whether a reasonable person viewing the evidence to favor the agency might make the same finding—they instead independently review it. That is, they decide anew whether the record sufficiently supports the finding. If so, they affirm it. If not, they disregard it. Put differently,

> [i]n a true de novo review, we are not limited to considering whether there was sufficient evidence to support the [agency's] findings nor whether the [superior] court erred in its determination. Rather, in a true de novo review, we use the assignments of error as a guide to the factual issues in dispute and make an independent factual determination based upon the record.

*Slack Nursing Home, Inc. v. Dep't. of Soc. Servs.*, 528 N.W.2d 285, 293 (Neb. 1995) (interpreting a statute like 910(F)).

¶35 We acknowledge that independently reviewing factual findings may feel foreign to reviewing courts, but that is what the legislature desired when it instructed that "the court shall decide all questions of fact without deference." A.R.S. § 12-910(F); *S. Ariz. Home Builders Ass'n v. Town of Marana*, 254 Ariz. 281, 286 ¶ 31 (2023) ("Statutory interpretation requires us to determine the meaning of the words the legislature chose to use."). We do not suggest, however, that reviewing courts must make their own factual findings. The record will usually include the ALJ's written decision with factual findings and legal conclusions. A.R.S. § 41-1092.08(A). If an agency rejects or modifies that decision, it will provide "a written justification setting forth the reasons for" doing so. A.R.S. § 41-1092.08(B). As has always been true, a regulated party challenging agency action must identify those factual findings with which

it disagrees and explain why, thus creating a "question of fact." *See* A.R.S. §§ 12-909(A), 12-910(F). Reviewing courts should independently resolve those fact questions based on the administrative record.

¶36 When an agency modifies an ALJ's factual finding without adequate support, a reviewing court has two options—it can disregard the modified factual finding or adopt the ALJ's original finding if the record instead supports it. But in all cases involving "the regulated party," reviewing courts must decide each "question of fact" without deferring to the agency, just as 910(F) instructs.

**c.**

¶37 The Commission Parties urge that judicial review mostly remains the same. Section 910(F) authorizes reviewing courts to "affirm, reverse, modify or vacate and remand *the agency action*." (Emphasis added.) And it then instructs them to affirm unless "*the agency's action* is contrary to law, is not supported by substantial evidence, is arbitrary and capricious or is an abuse of discretion." A.R.S. § 12-910(F) (emphasis added). The Commission Parties urge the status quo because that second sentence still requires review for substantial evidence. The Commission Parties take that to mean we still review all aspects of the agency decision for substantial evidence in all cases. But that argument ignores the distinction between the "agency action" and the "administrative decision."

¶38 The second sentence in 910(F) requires courts to review "the agency's action," not the agency's administrative decision. An "appealable agency action" is "an action" determining a party's "legal rights, duties or privileges[.]" A.R.S. § 41-1092(4). An "administrative decision," on the other hand, is "any decision, order or determination" that an agency renders if it "affects the legal rights, duties or privileges of persons" and terminates administrative proceedings. A.R.S. § 12-901(2). When an agency takes an "appealable agency action," that starts the administrative review process, and when an agency issues an "appealable administrative decision," that usually ends it. *See* A.R.S. §§ 41-1092.02(A), 41-1092.03(B), 41-1092.08(A); *see also* A.R.S. § 5-104(D) ("The [racing] commission may hear any appeal of a decision of the director in accordance with title 41, chapter 6, article 10."). So the agency action is not the administrative decision—the two are distinct.

¶39 After administrative review ends, judicial review begins. *See* A.R.S. § 41-1092.08(H). With certain exceptions, 910(F) governs the scope of that review. A.R.S. §§ 12-910(C), (D). But, in describing such review,

910(F) references only "the agency action." It does not reference the administrative decision terminating administrative review. Based on that text, reviewing courts determine whether substantial evidence supports the agency action, not the agency decision. And because the agency action is not the same as the administrative decision, requiring courts to review the agency action for substantial evidence does not also require them to review all aspects of the administrative decision for substantial evidence.

¶40 But they should reference the administrative decision when undertaking review. When reviewing agency action, courts need to know the agency's reasons for taking or upholding (or not) an agency action. The ALJ and agency must issue written decisions making or modifying findings of fact and conclusions of law. A.R.S. § 41-1092.08(A)–(B). And the final administrative decision is what tells reviewing courts how the agency justified the challenged action. *See* A.R.S. §§ 41-1092.08(H), 12-904(A), 12-910(A). But using the justifications in the administrative decision to review agency action does not make the administrative decision the agency action referenced in § 12-910(F)—the agency action and the administrative decision remain distinct. *See* A.R.S. § 12-904(B) (differentiating between the "[t]he original agency action from which review is sought" and "the decision by the [ALJ] and any revisions or modifications to the decision").

¶41 When reviewing agency action, courts also need to know what standard of review to apply. Before 2021, in regulated and non-regulated party proceedings alike, they reviewed fact questions for substantial evidence because that was the only standard in 910(F)—not because the administrative decision is the agency action. The legislature has now instructed that, when "the regulated party" challenges "the agency action," reviewing courts must decide legal and factual questions without deferring to the agency. A.R.S. § 12-910(F). In so doing, the legislature exempted fact findings in certain administrative decisions, when challenged, from substantial evidence review. So, in regulated-party proceedings, reviewing courts independently review legal and factual questions in the administrative decision before asking whether the decision provides substantial evidence for the agency action. That is the only way for the second, third, and fourth sentences in 910(F) to each do work in regulated-party proceedings. *See Bilke v. State*, 206 Ariz. 462, 464 ¶ 11 (2003) ("The court must give effect to each word of the statute.").

¶42 The Commission Parties also argue substantial evidence review still applies to fact questions because whether such evidence exists is a legal question we review independently. That argument's main premise is sound—substantial evidence is a legal question reviewed *de*

*novo. Brown v. Ariz. Dep't of Real Est.*, 181 Ariz. 320, 323 (App. 1995) (citation omitted) ("Whether substantial evidence supports the decision is a question of law[.]"). But the conclusion the Commission Parties draw from it—that substantial evidence review is non-deferential—is wrong.

**¶43** Yes, reviewing courts engage in substantial evidence review *de novo*. But that does not mean such review is non-deferential. Quite the opposite. Courts have repeatedly referred to substantial evidence review as deferential. *See, e.g., Siler v. Ariz. Dep't of Real Est.*, 193 Ariz. 374, 382 ¶ 41 (App. 1998) ("[T]he record must be viewed with deference to the factual findings with inquiry into whether substantial evidence supports those findings."); *In re Non-Member of State Bar of Ariz., Van Dox*, 214 Ariz. 300, 305 ¶ 19 (2007) ("Because substantial evidence supports the Hearing Officer's finding, we defer to it."); *see also Horne*, 242 Ariz. at 230 ¶ 13 (referring to substantial evidence review as "deferential"). Even the Commission Parties tacitly recognize that substantial evidence review involves deference. They call it "a low threshold" and "limited," which are just different ways of saying deferential. But they fail to recognize that, if reviewing courts still apply substantial evidence review in regulated-party proceedings, those courts will still defer when resolving fact questions. And that would disregard the legislature's instruction to ditch deference. *See* A.R.S. § 12-910(F).

**¶44** What is more, adopting a "substantial evidence is not deference" approach would make other parts of § 12-910 null or superfluous. Again, when a regulated party is involved, courts must decide *all questions of law* "without deference." A.R.S. § 12-910(F); *Silver v. Pueblo Del Sol Water Co.*, 244 Ariz. 553, 561 ¶ 28 (2018) ("The amendment [to § 12-910(F)] prohibits courts from deferring to agencies' interpretations of law."). Legal interpretations, like substantial evidence, are reviewed *de novo*. *Eaton v. Ariz. Health Care Cost Containment Sys.*, 206 Ariz. 430, 432 ¶ 7 (App. 2003) (citing *Jones v. County of Coconino*, 201 Ariz. 368, 370 ¶ 10 (App. 2001)). Using the Commission Parties' logic, we could still defer when answering legal questions so long as we did so during independent review. For example, during *de novo* review, this court could revert to giving "great weight" to agency interpretations of regulations they implement. *Marlar*, 136 Ariz. at 411. But, in applying that standard—even during *de novo* review—we would defer. And doing so would disregard the legislature's instruction to interpret the law "without deference." A.R.S. § 12-910(F). Succinctly put, applying deferential standards during independent review is still deference.

¶45 Applying substantial evidence to fact questions in regulated-party proceedings would also make § 12-910(G) superfluous. When the legislature eliminated deference on legal questions, it added § 12-910(G). 2018 Ariz. Sess. Laws, ch. 180, § 1. That provision states that, in certain health care appeals, the court must affirm the agency action unless it "is not supported by substantial evidence, is contrary to law, is arbitrary and capricious or is an abuse of discretion." A.R.S. § 12-910(G). In those appeals, we review the agency action like we did before the amendments to 910(F), even when a "regulated party" is involved. If the Commission Parties are correct that judicial review also remains the same in all other regulated-party proceedings, it is hard to see what work § 12-910(G) does. *See Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019).

¶46 Acknowledging the 2021 amendment must do some work, the Commission Parties suggest that non-deferential review is triggered only if the superior court had to make new factual findings. Nothing in the statute supports that position. Rather, 910(F) states that deference does not apply "[i]n a proceeding brought by or against the regulated party[.]" A "proceeding" is "[a]n act or step that is part of a larger action." *Proceeding*, Black's Law Dictionary (11th ed. 2019). When a party seeks judicial review—in the superior or appellate court—that is a "proceeding." *See Waetzig v. Halliburton Energy Servs., Inc.*, ___ U.S. ___, ___, 2025 WL 608110, *6 (Feb. 26, 2025) ("These definitions suggest that the term 'proceeding' encompasses all steps in an action[.]"). And, once there is a proceeding, the statute's text imposes only one more condition for non-deferential review—the proceeding must be "brought by or against the regulated party." A.R.S. § 12-910(F). The Commission Parties would add another condition—the superior court had to make new factual findings—thereby limiting the 2021 amendment to a subset of regulated-party proceedings. If the legislature wanted to limit non-deferential review in that manner, it would have said so. We will not write-in missing conditions. *City of Phoenix v. Butler*, 110 Ariz. 160, 162 (1973) (internal citation omitted) ("[T]he courts [do not] rewrite statutes.").

**d.**

¶47 Ron argues that, in regulated-party proceedings, we should instead defer to the ALJ's factual findings. But that argument slants too far the other way. Under 910(F), judicial review applies to "the agency action." Again, an "agency action" triggers a regulated party's ability to pursue administrative review. A.R.S. §§ 41-1092.03(B); § 41-1092(4). Although the ALJ's recommendation is created during the administrative review process and becomes part of the record, it is not "the agency action" courts review.

15

**3.**

**a.**

¶48     Moving on from factual findings, agency action sometimes hinges on the legal effect of those findings—called mixed questions of law and fact.  Arizona courts have long refused to defer on how to apply the law to facts.  *See, e.g.*, *Red Rover Copper Co. v. Indus. Comm'n*, 58 Ariz. 203, 214 (1941).  For example, over eighty years ago, our supreme court asked whether the Industrial Commission could apply equitable principles.  *Id.* Concluding the Commission could, the court reasoned that if the Commission "errs in its application of these rules its action is subject to review[.]"  *Id.*  And the court was confident such review would be meaningful because, while courts defer to the commission's factual findings, they had "never hesitated to consider the question of whether the law was properly applied to those facts independently."  *Id.*  Taking that cue, this court later confirmed that we "substitute our judgment for agency conclusions regarding the legal effect of its factual findings."  *Sanders v. Novick*, 151 Ariz. 606, 608 (App. 1986) (citing *Gardiner v. Ariz. Dep't of Econ. Sec.*, 127 Ariz. 603, 606 (App. 1980)); *see also Winters v. Ariz. Bd. of Educ.*, 207 Ariz. 173, 178 ¶ 14 (App. 2004) (refusing to defer to the Board of Education's conclusion that a teacher engaged in unprofessional conduct).

**b.**

¶49     Reviewing courts still independently review mixed questions.  If anything, 910(F) now dictates we do so.  By requiring non-deferential review of factual *and* legal questions, the statute likely requires non-deferential review of mixed questions.  *See Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 227 (2020) ("We conclude that the phrase 'questions of law'" includes "the application of a legal standard to undisputed or established facts.").  But, regardless, nothing in 910(F) displaces the historical practice of independently deciding mixed questions.  *See Sanders*, 151 Ariz. at 608; *Winters*, 207 Ariz. at 178 ¶ 14.

**4.**

**a.**

¶50     At times, agency action turns on witness credibility.  Courts have always refrained from second-guessing ALJ credibility findings.  *See W. States Petroleum, Inc. v. Ariz. Dep't of Env't Quality*, 232 Ariz. 252, 253 ¶ 7 (App. 2013) ("Issues regarding witness credibility are for the ALJ to decide, not the superior court or this court.") (citation omitted); *Siler*, 193 Ariz. at

382 ¶ 41 ("On questions of credibility, the administrative hearing officer is the proper judge."). That makes sense because the ALJ is the one who "had the opportunity to look the witness in the eye and reach a conclusion with respect to his veracity or lack thereof." *Adams v. Indus. Comm'n*, 147 Ariz. 418, 421 (App. 1985).

¶51     This court has, however, allowed agencies to second-guess ALJ credibility findings, even when agencies do not see or hear from any witnesses (on a cold record*). See Ritland v. Ariz. State Bd. of Med. Exam'rs*, 213 Ariz. 187, 191 ¶ 12 (App. 2006). In *Ritland*, this court attempted to reconcile "deference to the trier of fact with the [agency's] duty and authority to render the final decision." 213 Ariz. at 191 ¶ 11. It held that agencies are "not bound by the ALJ's findings of fact, including those related to credibility." *Id.* ¶ 12. But recognizing "the importance of the ALJ's observation of the demeanor and attitude of the witnesses," it instructed agencies to give ALJ credibility findings "greater weight than other findings of fact more objectively discernible from the record." *Id.* ¶ 13. It also instructed agencies not to reject ALJ credibility findings without including "factual support" for doing so. *Id.* ¶ 14. And, while reviewing courts should scrutinize an agency's "disagreements with an ALJ's credibility findings," we said courts should not reverse when "there is substantial evidence" supporting those disagreements. *Id.* at 191–92 ¶ 15.

**b.**

¶52     As revised, 910(F) puts courts in a difficult position when reviewing credibility findings in regulated-party proceedings. As explained, agencies—not ALJs—are responsible for issuing final administrative decisions subject to judicial review. But witness credibility is a question of fact, so 910(F) no longer allows reviewing courts in regulated-party proceedings to defer when agencies modify an ALJ's credibility finding. *Cf. State v. Harrison*, 111 Ariz. 508, 509 (1975) ("The credibility of witnesses is an issue of fact to be resolved by the jury[.]"); *State v. Hernandez*, 112 Ariz. 246, 248 (1975) ("[T]he credibility of witnesses when their stories conflict is a question of fact for the jury."); *Logerquist v. McVey*, 196 Ariz. 470, 488 ¶ 52 (2000) (noting the jury determines the credibility of testimony as an issue of fact). Section 910(F) instead requires reviewing courts to resolve credibility disputes without deferring to anyone.

¶53     But that creates challenges because reviewing courts are ill-equipped to make credibility findings on a cold record. *See Brooks v. Indus. Comm'n*, 24 Ariz. App. 395, 397 (1975) ("[W]here the credibility of witnesses is an issue, it is almost impossible to make that judgment from a written

record."). Plus, our supreme court and the United States Supreme Court have suggested that reversing credibility determinations on a cold record raises due process concerns. *See Pima Cnty. Juv. Action No. J-63212–2*, 129 Ariz. 371, 375 (1981) (holding that a reviewing court "violated the Due Process Clause of the Fourteenth Amendment" because it "necessarily rejected the referee's credibility assessments without having personally heard the disputed testimony"); *United States v. Raddatz*, 447 U.S. 667, 681 n.7 (1980) ("[W]e assume it is unlikely that a district judge would reject a magistrate's proposed findings on credibility . . . and substitute the judge's own appraisal; to do so without seeing and hearing the witness . . . whose credibility is in question could well give rise to serious questions[.]"); *cf. Johnson v. Finn*, 665 F.3d 1063, 1074 (9th Cir. 2011) (citations omitted) ("Taking the Supreme Court's various hints, [five circuits] have all held that a district judge may not reject the credibility finding of a magistrate judge without holding a new evidentiary hearing.").

¶54 We resolve the conundrum this way: When an agency does not hear live testimony before modifying an ALJ's credibility finding or making their own, a reviewing court defers only to the ALJ's credibility finding unless it is clearly erroneous. *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499–500 (1984)) ("[C]redibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the 'opportunity to observe the demeanor of the witnesses[.]'").

¶55 This solution has at least four benefits. First, the ALJ's credibility finding is part of the administrative record, so deferring to that finding follows 910(F)'s instruction to "review[] the administrative record." Second, deferring to the ALJ recognizes that reviewing courts are ill-equipped to determine credibility on a cold record. *See Brooks*, 24 Ariz. App. at 397. Third, deferring avoids the serious constitutional questions that would arise if reviewing courts were to make credibility findings on a cold record. *See Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 230 (2020) (citation omitted) ("[I]f possible, we will construe [a statute] to avoid rendering it unconstitutional."); *J-63212–2*, 129 Ariz. at 375; *Raddatz*, 447 U.S. at 681 n.7. And fourth, deferring aligns with prior caselaw saying that "[i]ssues regarding witness credibility are for the ALJ to decide, not the superior court or this court"—caselaw that remains valid. *W. States Petroleum*, 232 Ariz. at 253 ¶ 7 (quoting *Siler*, 193 Ariz. at 382 ¶ 41).

**5.**

**a.**

¶56      That leaves agency discretion and expertise. The legislature—within certain bounds—may delegate discretion to an agency in implementing a law. In other words, "the legislature may not delegate the authority to enact laws to a government agency, but it can give agencies discretion as to execution of the laws." *Lewis v. Ariz. Dep't of Econ. Sec.*, 186 Ariz. 610, 615 (App. 1996); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion."). When a statute grants agency discretion, reviewing courts determine the outer bounds of that discretion (a legal question) and then whether the agency acted within those bounds. *See Lewis*, 186 Ariz. at 615; *Loper Bright*, 603 U.S. at 395. Traditionally, reviewing courts defer when deciding whether an agency acted within its discretion. *See Kisor v. Wilkie*, 588 U.S. 558, 633 (2019) (Kavanaugh, J., concurring) ("[A] judge" can "engage in appropriately rigorous scrutiny of an agency's interpretation of a regulation," and defer "to an agency's reasonable policy choices within the discretion allowed by a regulation[.]").

¶57      Agency action also sometimes involves expertise. This court has long recognized that reviewing courts "may not function as a 'super agency' and substitute its own judgment for that of the agency where . . . agency expertise [is] involved." *DeGroot*, 141 Ariz. at 336.

**b.**

¶58      Deference to agency discretion and expertise still plays a role in regulated-party proceedings under 910(F). Although reviewing courts must decide all legal and factual questions without deferring, if an agency uses discretion or expertise in other ways, reviewing courts can defer on those matters.

¶59      An example may help illustrate. The Commission has discretion to make certain licensing and permitting decisions. For example, the Commission "*may* refuse to approve" a permit to hold a racing meeting if "[t]he granting of a permit . . . in the locality set out in the application is not in the public interest or convenience." A.R.S. § 5-108(A)(2)(c) (emphasis added). So even when a permit in the locality requested is not in the public interest, the Commission "may" still grant the permit. *See* A.R.S. § 5-108(A)(2)(c). And when exercising that discretion, the Commission can use expertise about where racing meetings should be located.

¶60      Imagine the Commission decides that a particular locality is not in the public interest, but it still grants a permit. In making that decision, the Commission made factual findings about the "locality set out in the application." It also interpreted the phrase "locality" or "public interest or convenience." And it applied its factual findings to the statutory standard to conclude the permit is not in the public interest. But, even after that conclusion, it still exercised discretion to grant the permit.

¶61      If that action is challenged, a reviewing court would not defer to the Commission's factual findings, legal interpretations, or applications of law to fact. But assuming the reviewing court agrees—without deferring—that the locality is not in the public interest, it could then defer to the Commission's discretionary decision to grant the permit.

**B.**

¶62      In short, the framework for reviewing agency action in regulated-party proceedings is this: First, a reviewing court should determine whether "the regulated party" is challenging agency action. Second, it should identify the agency action at issue. Third, it should determine whether the administrative decision terminating administrative review contains legal conclusions, factual findings, mixed questions of law and fact, or relies on agency discretion or expertise. When "the regulated party" challenges conclusions of law, factual findings, or mixed questions of law and fact, the reviewing court must not defer to the agency in resolving those challenges. Instead, it must independently resolve them. After doing so, the reviewing court should ask whether the administrative decision adequately supports the agency action. Ordinarily, that will require the reviewing court to determine whether its independent factual and legal conclusions, along with any unchallenged agency conclusions, provide substantial evidence supporting the agency action.

**II.**

¶63      We now apply that framework to the agency action here.

**A.**

¶64      We first ask whether Ron is "the regulated party." We need not pause long here because the Commission Parties do not dispute that Ron is "the regulated party." So the amendments to 910(F) apply.

**B.**

¶65       We next identify the agency action.  Again, an "appealable agency action . . . determines the legal rights, duties or privileges of a party[.]"  A.R.S. § 41-1092(4).

¶66       Recall that Ron applied for a license in November 2013.  At that time, Arizona law provided that "[t]he director [of the Racing Department] shall license personnel and shall regulate and supervise all racing meetings[.]"  A.R.S. § 5-104(B) (2013).  And it explained when the Racing Department "may deny or refuse to renew a license."  A.R.S. § 5-108(A)(3), (A)(4) (2013); *see also* A.R.S. § 5-101(10) (2013) (defining "Department" as "the Arizona department of racing").

¶67       In its notice, the Racing Department relied on § 5-108 to deny Ron a license, and it gave reasons for its denial.  It also acknowledged that "[a] person to whom a license has been denied may request a hearing on this determination *as an 'appealable agency action'* pursuant to A.R.S. § 41-1092."  (Emphasis added).  Ron requested a hearing, so the administrative review process began.  But, at least in this case, nothing that occurred during that process changes that the "agency action" we review is the Racing Department's license denial.  *See* A.R.S. § 41-1092(4).

¶68       To determine whether substantial evidence supports that agency action, we review the justifications in the Commission's administrative decision.  *See Sec. and Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."); *see also Madsen v. Fendler*, 128 Ariz. 462, 466 (1981) (a court reviewing an agency action "is limited to the questions properly raised before the administrative hearing").

**C.**

¶69       Whether that decision justifies the agency action here turns mostly on factual findings.  The decision does not rely on agency discretion or expertise.  Thus, under 910(F), we decide whether to affirm the license denial by reviewing the administrative record and deciding all questions of law and fact without deferring to the Commission.

**1.**

¶70       The Commission's decision mostly relies on A.R.S. §§ 5-108(A)(3) and 5-108(A)(4).  The former section says, "The department may

deny . . . a license . . . for any person who has made a knowingly false statement of a material fact to the department." A.R.S. § 5-108(A)(3). The latter says, "The department may deny . . . a license . . . if the applicant has failed to meet any monetary obligation in connection with any racing meeting held in this state." A.R.S. § 5-108(A)(4). Both sections give the Commission discretion to deny a license, but only when the applicant has engaged in prohibited conduct.

¶71        For Ron to have made a knowingly false statement of material fact, he had to (1) make a statement, (2) that was false, (3) while knowing it was false, and (4) that was material to the Racing Department. *See* A.R.S. § 5-108(A)(3). For Ron to have breached a monetary obligation, he had to (1) breach, (2) a monetary obligation, (3) in connection with, (4) any racing meeting, (5) held in this State. *See* A.R.S. § 5-108(A)(4). Whether Ron engaged in prohibited conduct raises fact questions, which we independently decide. A.R.S. § 12-910(F); *supra* ¶ 34.

**2.**

¶72        The Commission found Ron knowingly made three false statements: (1) he did not disclose that he could pay off his note payable by causing Bruin Corp. to transfer land to TP Racing ("Note-Land Swap Option"); (2) he lied about his wife owning Bruin Corp.; and (3) he lied about Bruin Corp.'s relationship to TP Racing. The Commission also found that Ron did not prove that he met all monetary obligations regarding racing meetings. Ron challenges each of those findings and conclusions.

**a.**

¶73        First, the Commission found that Ron did not tell the Racing Department about the Note-Land Swap Option.

**i.**

¶74        Contrary to that finding, Ron (or his agents) disclosed the Option. The Commission did not dispute that the Racing Department knew that Ron signed a promissory note as his capital contribution. The Commission instead found that Ron did not tell the Racing Department that he could pay off that note with land. We resolve that question differently.

¶75        Ron testified he told the Racing Department about the Note-Land Swap Option in 2000. After hearing that testimony, the ALJ found it credible. But the Commission concluded otherwise on a cold record. Whether Ron was credible is a fact question (which the Commission

22

admitted during oral argument), so we no longer defer to the Commission. *See* A.R.S. § 12-910(F). Instead, we defer to the ALJ because he "saw witnesses, heard evidence and the manner in which it was given, and weighed that evidence before reaching a decision." *Ohlmaier v. Indus. Comm'n*, 161 Ariz. 113, 119 (1989); *see supra* ¶ 54. There is no basis in this record to conclude that the ALJ erred. We, therefore, adopt the ALJ's finding that Ron credibly testified that he told the Racing Department about the Note-Land Swap Option in 2000.

¶76    But even without that credibility finding, plenty of evidence corroborates Ron's testimony. To start, several TP Racing executives confirmed the Note-Land Swap Option's existence and purpose. For example, Buzz Alston, TP Racing's counsel, testified that "Jerry and Ron were going to . . . convey their land to [TP Racing] and their notes would be extinguished[.]" John Mangum, another lawyer for TP Racing, had a similar understanding. Patty Chakour, TP Racing's Chief Financial Officer, said she "view[ed] Ron's note as a placeholder . . . securing his promise to put the Bruin land into" TP Racing.

¶77    In 2000, TP Racing's outside auditors documented the Note-Land Swap Option and the Racing Department's role in it. The auditors explained the arrangement this way: "If Jerry does not give [TP Racing] the Land at the end of agreement He [sic] would have to pay [TP Racing] the $14,065,000 and [Ron] would have to pay [TP Racing] $4,635,000." And the auditors documented that the Note-Land Swap Option existed because the Racing Department "required [Jerry] to be a 50% owner of TP Racing[.]"

¶78    Then, in 2003, TP Racing applied to renew its permit. During that process, TP Racing provided the Racing Department with a balance sheet. It listed "Notes Receivable – Related Parties" for $18,700,000 (the combined amount of Jerry and Ron's notes) to end 2002. While interviewing a TP Racing representative, a Racing Department investigator asked whether that amount was "related to the 1031 property exchanges that you and the group affected to buy Turf back in June 2000 . . . because it is the same amount as the Section 1031[.]" The representative confirmed the amount was the same and it was "tied in" to the 1031 exchange.

¶79    During the permitting process, the Racing Department also hired a certified public accountant ("CPA"). He reported back with findings and recommendations. In so doing, he viewed the option for Jerry and Ron to pay off their notes with land as beneficial to TP Racing.

¶80　　　　In his report, the CPA explained that "when horses race at Turf Paradise, they actually run on property owned by three separate entities." He observed that the land is "leased back to [TP Racing] through three separate lease agreements." But that arrangement would change. He explained that, because of meetings with the Racing Department, TP Racing would "accept[] the land owned by J. Simms Enterprises in exchange for a $14,065,000 note owed to [TP Racing] by [Jerry]." And TP Racing would receive land "which is essential to [its] operations" while giving Bruin Corp. land which is non-essential to racing. Following those transactions, TP Racing would directly own all essential real estate.

¶81　　　　The CPA also noted that retiring the notes receivable would improve TP Racing's finances. He explained that TP Racing's "audited financial statements include $18,700,000 in current assets for notes receivable from [Jerry] and [Ron]." He confirmed those notes were unsecured and had not been paid off for three years, and he thought, given Jerry and Ron's significant net worth, "it is unlikely that [TP Racing] would make a demand for any significant payment under these notes" any time soon. He reiterated that, due to meetings with the Racing Department, TP Racing would "accept[] land owned by J. Simms Enterprises, LLC . . . for the $14,065,000 note owed" by Jerry. And he explained why doing so would improve TP Racing's finances: it would replace "a note (for which no payment would likely be demanded by [TP Racing]) with real estate essential to its operations."

¶82　　　　Three days later, the Racing Department sent the Commission a written report about TP Racing's permit. The report attached the CPA's findings and recommendations. It disclosed that two entities leased land required for racetrack operations to TP Racing. Those two parcels, "owned by unlicensed entities, divide the actual track and auxiliary areas." To extend TP Racing's permit, the report recommended that those two parcels "be transferred without encumbrance to [TP Racing]."

¶83　　　　Shortly thereafter, Jerry caused J. Simms Enterprises to deed its land to TP Racing in exchange for cancelling Jerry's note. Similarly, Ron caused Bruin Corp. to trade land under the racetrack for land that is not. Neither transaction bothered the Racing Department. Rather, it encouraged those transactions to renew TP Racing's permit because they ensured TP Racing owned all land under the racetrack and, as to Jerry's transaction, traded a note receivable for a current asset.

¶84        Finally, Jerry confirmed everyone knew about the Note-Land Swap Option. In 2010, Jerry demanded that Ron pay off his promissory note by having Bruin Corp. transfer land to TP Racing. Jerry wrote,

> If you will recall, *all of us agreed* and expected that the land I utilized for a 1031 exchange would ultimately be . . . rolled into Turf Paradise. I did that. So far, you have not[.] All that was ever contemplated is that the track would own the property. Surely you can find a way to accomplish the transaction. *Then the track . . . would not have to worry about collecting a $4,635,000 note from you*.

(Emphasis added). Given the other evidence discussed, it is improbable that "all of us" did not include the Racing Department. In sum, the Racing Department knew that Jerry and Ron could pay off their promissory notes by having their entities transfer land to TP Racing.

## ii.

¶85        Next, we turn to materiality. Even if Ron did not disclose the Note-Land Swap Option, we conclude that failure was immaterial because it would not have impacted the Racing Department's decisions.

¶86        Ordinarily, whether the failure to do something is material is a question of fact. *See J.W. Hancock Enters., Inc. v. Registrar of Contractors*, 126 Ariz. 511, 514 (1980) ("The findings of fact also clearly establish that appellant failed to conform to specifications. Whether such failure was material is also a question of fact."); *Hill v. Jones*, 151 Ariz. 81, 86 (App. 1986) ("Unless reasonable minds could not differ, materiality is a factual matter which must be determined by the trier of fact."). But one could argue—Ron's counsel did at oral argument—that materiality is a mixed question of law and fact. Either way, we determine materiality *de novo*. *See* A.R.S. § 12-910(F); *supra* ¶¶ 34, 49.

¶87        Materiality is "an objective standard." *Hirsh v. Ariz. Corp. Comm'n*, 237 Ariz. 456, 463 ¶ 27 (App. 2015). A statement is material if it is significant enough to affect the outcome of the agency's decision. *Cf. id.* at 463–64 ¶ 27 (internal quotation marks omitted) (quoting *Trimble v. Am. Sav. Life Ins. Co*, 152 Ariz. 548, 553 (App. 1986)) ("The requirement of materiality is satisfied by a showing of substantial likelihood that, under all the circumstances, the misstated or omitted fact would have assumed actual significance in the deliberations of a *reasonable* buyer."); A.R.S. § 13-2701(1) ("'Material' means that which could have affected the course or outcome of any proceeding or transaction."). Applying that standard, a statement is

material if it was significant enough to affect the outcome of the Racing Department's licensing and permitting decisions in 2000 or 2003. Put differently, materiality hinges on whether the withheld information would have made the Racing Department less likely to grant Ron a license and TP Racing a permit.

¶88        We conclude the Racing Department would have granted Ron a license even if it knew about the Note-Land Swap Option. As explained, the Racing Department knew Jerry and Ron gave promissory notes for their capital contributions. The CPA who reviewed TP Racing's finances reported back that TP Racing was not likely to demand repayment of those notes anytime soon. But, because of meetings with the Racing Department, TP Racing agreed to accept land from J. Simms Enterprises to pay off Jerry's $14 million note. TP Racing would also accept Bruin Corp.'s land under the racetrack for non-essential land. The CPA thought both transactions would be beneficial—they would ensure TP Racing owned all land under the racetrack and improve TP Racing's finances.

¶89        There is no evidence the Racing Department thought Ron's note was any different than Jerry's. In fact, Jerry confirmed in 2010 that both notes were the same. And, though Jerry's note was larger than Ron's, nothing supports that the Racing Department would not have viewed the Note-Land Swap Option the same as Jerry's transaction—positively. After all, the Note-Land Swap Option would have the same benefits. It would allow Ron to transfer land under Turf Paradise (even if not essential to horse racing) and allow TP Racing to exchange a note receivable for a current asset, thereby improving TP Racing's finances. Even if the Racing Department did not know about the Note-Land Swap Option, disclosure would have made the Racing Department more likely (not less) to grant Ron a license and TP Racing a permit. Thus, any failure to disclose the Note-Land Swap Option was immaterial.

**b.**

¶90        Second, the Commission found Ron violated § 5-108(A)(3) by telling the Racing Department until 2006 that his wife owned Bruin Corp. Ron unquestionably made false statements about Bruin Corp.'s ownership. But we must determine whether those false statements were made knowingly and were material. *See* A.R.S. § 5-108(A)(3).

**i.**

¶91        We begin with the "knowing" requirement. That issue presents a fact question, which we review *de novo*. *See State v. Romero*, 248

Ariz. 601, 604, ¶ 12 (App. 2020) (whether the defendant knowingly engaged in conduct is a fact question because it "refers to factual knowledge"); A.R.S. § 12-910(F); *supra* ¶ 34.

¶92 Ron testified to the ALJ that his false statements about Bruin Corp.'s ownership were simply mistaken. He explained that they stemmed from thinking about Bruin Corp.'s ownership from a family standpoint, not a legal one. The ALJ found Ron's explanation credible.

¶93 Even if that explanation was credible, we disagree that it makes Ron's misstatements unknowing. The term "knowingly" means "only a knowledge that the facts exist that bring the act or omission within the provisions of the statute using such word." A.R.S. § 1-215(17)(a). This court has equated "knowingly" with "willfully." *State v. Burke*, 238 Ariz. 322, 326–27 ¶ 8 (App. 2015). And "willfully" is defined as "with respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that the person's conduct is of that nature or that the circumstance exists." A.R.S. § 1-215(42).

¶94 Ron's explanation—that he was thinking about Bruin Corp. from a family standpoint, not a legal one—suggests that, from a legal standpoint, he knew his wife did not own Bruin Corp. There is also little doubt that Ron had access to information about who owned Bruin Corp. That makes Ron's misstatements objectively knowing, even if he subjectively mistook the information sought.

**ii.**

¶95 We next decide whether Ron's misstatements were material. Starting in 2006, Ron accurately disclosed that he owned Bruin Corp. So we focus on whether knowing that Ron, rather than his wife, owned Bruin Corp. was material to the Racing Department's licensing or permitting decisions from 2000 to 2006. We conclude such knowledge was immaterial because it would not have affected the outcome of those licensing and permitting decisions.

¶96 In fact, by inaccurately disclosing that his wife owned Bruin Corp., Ron made it less likely that the Racing Department would grant TP Racing a permit and more likely his wife would come under scrutiny. As discussed, in 2000, Bruin Corp. owned land under the racetrack at Turf Paradise and leased it to TP Racing. The Racing Department approved that arrangement, despite that a non-licensed entity held land under the racetrack beyond TP Racing's control.

¶97      Ron later had Bruin Corp. trade that land for non-essential land. But before that happened, the Racing Department's CPA flagged whether several unlicensed entities and individuals should be licensed. He identified Ronald A. Simms Perpetual Asset Shield Trust, Bruin Corp., J. Simms Enterprises, LLC, TP Plaza LLLP, and Ron's wife as unlicensed "related parties." He explained that Ron's wife was "the owner of Bruin Corporation and a guarantor of [TP Racing's] long-term bank debt." Because J. Simms Enterprises and Bruin Corp. agreed to transfer all essential land to TP Racing, the CPA concluded they would "no longer [have] any significant operating influence over" TP Racing. When completed, those transactions "would leave only Ronald A. Simms Perpetual Asset Shield Trust and [Ron's wife] as unlicensed entities that could have an influence over [TP Racing's] operations." But because "Ronald A. Simms Perpetual Asset Shield Trust is 100% controlled by a current licensee, [Ron], and [Ron's wife is] only a guarantor of [TP Racing's] debt by virtue of her marriage to [Ron], it would appear, from a general business perspective, to be unnecessary to license those entities."

¶98      The CPA recommended that the Racing Department "determine if [Ron's wife], Bruin Corporation and J. Simms Enterprises, LLC are required to be licensed." He explained that Ron's wife "owns 100% of Bruin [Corp.] and is a guarantor of [TP Racing's] bank debt" and neither was licensed. But TP Racing "is in the process of acquiring all real estate necessary for its daily operations," so "J. Simms Enterprises will no longer have any association with [TP Racing] and Bruin [Corp.] will own and lease land to [TP Racing] which is non-essential to horse racing operations." And he concluded that "[t]his course of action would appear to alleviate any need to license these entities and [Ron's wife.]" The Racing Department did not raise any licensing issues to the Commission.

¶99      Despite believing Ron's wife owned 100% of an entity that controlled land under the racetrack, the Racing Department did not require her to be licensed. In truth, Ron owned 100% of Bruin Corp., and so, like Ronald A. Simms Perpetual Asset Shield Trust, Bruin Corp. was "100% controlled by a current licensee, [Ron]," making it "unnecessary to license" that entity. Although Ron's wife guaranteed TP Racing's debt, the Racing Department knew she had done so, yet it did not require her to be licensed. Finally, the Commission found that, after Bruin Corp. transferred land under the racetrack to TP Racing, "there was no further concern over the ownership of Bruin and its authority over the race track until the denial of Mr. Simms' license application." We agree with that finding, but the conclusion we draw from it is that Ron's knowing misstatements about who owned Bruin Corp. were immaterial.

**c.**

¶100        Third, the Commission found that Ron made this misstatement of material fact to the Racing Department: "Bruin was nothing more than a landlord with respect to the race track."  We conclude that statement was neither false nor material.

¶101        It was true because Bruin Corp. was, in fact, only a landlord in relation to the racetrack.  The record does not suggest that Bruin Corp. ever had anything but a landlord-tenant relationship with TP Racing.  That Ron and TP Racing agreed that Ron could pay off his promissory note with Bruin Corp.'s land—an arrangement the Racing Department knew about— did not make Bruin Corp. more than a landlord to the racetrack.  The Commission concluded that it "need not (and does not) decide whether an oral agreement existed between [Ron] and [Jerry] that would have permitted [Ron] to pay off his promissory note by transferring the Bruin land to TP."  It is hard to square that non-conclusion with the Commission's conclusion that Bruin Corp. was more than a landlord.

¶102        After Bruin Corp. transferred land under the racetrack, Bruin Corp. had no relationship—landlord or otherwise—to the racetrack.  Instead, if anything, Bruin Corp. was TP Racing's landlord as to land elsewhere within the Turf Paradise complex.  Thus, Bruin Corp. was never anything more than a landlord vis-à-vis the racetrack, making Ron's statement about it true.

¶103        On materiality, the Racing Department knew how Ron and Jerry could pay off their promissory notes.  *See supra* ¶ 84.  And yet the Racing Department did not object.  If nothing else, Ron and Jerry's ability to control their related entities' land and swap TP Racing's note receivables for current assets comforted the Racing Department.  So Ron's statements about Bruin Corp.'s relationship with the racetrack were immaterial.

**d.**

¶104        Finally, the Commission concluded that it could not determine whether Ron met all "monetary obligation[s] in connection with any racing meeting held in this state."  A.R.S. § 5-108(A)(4).  The Commission could not do so, it thought, because of "ongoing civil litigation about whether [Ron] failed to pay off the promissory note he gave to" TP Racing.  The Commission instead concluded that Ron failed to show he satisfied § 5-108(A)(4).

¶105    That conclusion requires us to interpret the phrase "in connection with any racing meeting held in this state."  We do so *de novo*. *See* A.R.S. § 12-910(F); *supra* ¶ 31.  The phrase "racing meeting" is defined as "a number of days of racing allotted by the commission in one permit." A.R.S. § 5-101(25).  Applying that definition, Ron could only violate § 5-108(A)(4) by breaching a monetary obligation in connection with racing days allotted in TP Racing's permit.  The record does not support that Ron's promissory note was made in connection with racing days allotted in TP Racing's permit.   Rather, the promissory note was Ron's capital contribution.  Ron did not violate § 5-108(A)(4).

### D.

¶106    Our last task is to decide whether the Commission's decision provides substantial evidence supporting the Racing Department's denial of Ron's license application.  To repeat, "[s]ubstantial evidence is evidence which would permit a reasonable person to reach the" agency's result. *Sierra Club-Grand Canyon Ch.*, 237 Ariz. at 575 ¶ 22.

¶107    We have found that Ron did not make a knowingly false statement of material fact or breach a monetary obligation in connection with any race meeting.  Without Ron doing one of those two things, the Racing Department lacked discretion to deny Ron a license.   The Commission's decision and the record do not support that Ron otherwise did anything allowing the Racing Department to deny him a license. Neither the Commission's decision nor the record provides substantial evidence supporting the agency action here.

### ATTORNEY FEES AND COSTS

¶108    Ron requests attorney fees and costs from the Commission under A.R.S. §§ 12-341, 12-348, and 12-2030.  As the prevailing party on appeal, Ron is entitled to recover his appellate attorney fees and costs from the Commission under §§ 12-341 and 12-348(A)(2) upon compliance with Arizona Rule of Civil Appellate Procedure 21.

### CONCLUSION

¶109    Why would the legislature instruct courts to independently answer legal and factual questions when reviewing agency action?  This case might demonstrate why.  At the start, Jerry's counsel provided the Racing Department with evidence against Ron and then helped draft the document denying Ron's license. *Simms*, 253 Ariz. at 216 ¶¶ 5–6.  During the Commission proceedings, Jerry had contact with various

commissioners.  *Simms*, 2022 WL 1256594, at \*1 ¶¶ 2–3.  Those proceedings produced an administrative decision setting aside the ALJ's credibility findings and relying on statements Ron made over a decade prior, despite that, in the interim, the Racing Department repeatedly granted Ron a license.  Under the old regime, with deference to agency factfinding, we probably would have to affirm the agency action here.  Under the new regime, with full-throated review of agency factfinding, the Racing Department's action cannot stand.

¶110        Although we cannot order the Commission to grant Ron a license, we vacate the superior court's judgment and remand to enter judgment for Ron on his challenge to the license denial.  We deny all unresolved requests for judicial notice.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:       TM